[Civ. No. 1699. Third Appellate District.—July 14, 1917.]

H. E. EASTON, Doing Business as Quality Bakery, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and A. J. PILLSBURY et al., as Members, etc., Respondents; A. C. SOHN, Applicant.

WORKMEN'S COMPENSATION ACT—FINDINGS OF COMMISSION—REVIEW.—
In a proceeding to review an award of compensation made by the Industrial Accident Commission, the court is not at liberty to disturb the conclusion reached by the commission, where there is sufficient evidence to justify the findings.

ID.—INJURY TO BAKERY WAGON DRIVER—RELATIONSHIP OF PARTIES—
EMPLOYER AND EMPLOYEE.—The driver of a bakery wagon selling

bread on a commission basis under a guaranty of fifteen dollars per week, who chose his own time to go out and return, who was not directed where to go or to whom to sell, and who performed certain duties for the owner of the bakery for which he received no additional compensation, such as delivering bread to wholesale and retail customers who made purchases at the bakery, is an employee of the owner within the provisions of the Workmen's Compensation Act, and the owner is liable for injuries received by the driver while engaged in unloading his wagon of unsold bread at the close of the day's deliveries.

APPLICATION for a Writ of Review originally made to the District Court of Appeal for the Third Appellate District to review an award made by the Industrial Accident Commission.

The facts are stated in the opinion of the court.

R. W. Dodge, for Petitioner.

Christopher M. Bradley, for Respondents.

CHIPMAN, P. J.—This is an action brought by petitioner for a review of an award made by the defendant in favor of one A. C. Sohn, as an employee of petitioner. In his application for adjustment of his claim, said Sohn alleged that he received the injury complained of on December 1, 1916, while in the service of said petitioner, and while engaged in driving a wagon for the purpose of delivering bread on behalf of petitioner in the city of Stockton, California. It is alleged in the application that the accident from which the injury complained of arose, occurred in front of petitioner's bakery-shop while said applicant Sohn was engaged in unloading a bakery wagon; that there being no step on the wagon, he was obliged to use the hub of the wheel in order to get on and off; that in thus using the wheel for a step, his foot slipped and he received a broken knee-cap. He was asked to explain how the injury happened, and if he had stepped up on the hub with the right foot, and he answered: "With the left foot, and when that slipped off, it threw the weight on my right one and it simply bent the knee back and broke the knee-cap. Q. Were you getting on the wagon or off the wagon? A. I was getting off the wagon."

It is contended that the following findings are not supported by the evidence: "1. That J. Sohn, applicant herein, was injured on the first day of December, 1916, at Stockton, California, while in the employment of defendant, H. E. Easton, doing business under the name and style of Quality Bakery. 2. That the said employment of applicant was as a salesman and delivery-man, working upon a commission basis on the amount of goods sold by him, and that such occupation by applicant was not that of an independent contractor, but was that of an employee of defendant. 3. That said injury arose out of and happened in the course of said employment, was proximately caused thereby, and occurred while the injured employee was performing service growing out of and incidental thereto, in the following manner: While alighting from his wagon, applicant slipped and fell and fractured the patella or knee-cap."

The sole question as to which there appears to be any controversy is whether or not the injured man was an employee of the petitioner or was an independent contractor. The nature of his employment appears from the testimony of the applicant, Sohn, and that of the petitioner, Easton. There is a very sharp conflict in the testimony of these two witnesses upon this question. The findings of the commission seem to have been based upon the testimony of the applicant Sohn and the circumstances surrounding his service, and if there was evidence sufficient to justify the findings, we are not at liberty, under the rule, to disturb the conclusion reached by the commission based upon such findings. (*Western Indemnity Co.* v. *Pillsbury,* 172 Cal. 807, [159 Pac. 721].) If applicant was not an employee of petitioner, or if he was an independent contractor, the commission had not authority to award compensation. (*Carstens* v. *Pillsbury,* 172 Cal. 572; [158 Pac. 218].)

Applicant Sohn testified that he entered the employment of petitioner on the tenth day of October, 1916. "Q. What were the terms of the contract of hire between you? A. I was guaranteed fifteen dollars per week. Q. When you say that you were guaranteed fifteen dollars a week, if you sold bread on a commission basis in excess of that amount, did you receive the amount over and above the fifteen dollars per week? A. I returned him all that I had taken in on this commission and over fifteen dollars I give back to him at the

end of the week.  He kept track of this twenty per cent commission and at the end of the week if that commission overrun the amount of fifteen dollars, I paid it back to him.'' He testified that the horse and wagon used by him for the distribution of the bread and that he was driving was furnished by petitioner at his own cost, the arrangement being that he was to furnish the horse and wagon that applicant drove on his route; that this wagon had the name of ''The Quality Bakery'' painted on it by petitioner's direction and the phone number of his place of business.

Witness was asked if fifteen dollars was the average weekly wage of men driving bakery wagons in Stockton, and he replied that it was not the union wage and was not the average wage, which was eighteen dollars per week.  ''Q. Were you willing to work for fifteen dollars?  A. When I went to Mr. Easton, he told me that he could not afford to pay over fifteen dollars a week, and so I went to work for him because I was not making very much money when I was working on a commission.  Q. I cannot see what the necessity was for a commission basis between you and Mr. Easton if you had a guaranteed salary of fifteen dollars a week, and if you made over that on the commission basis, you returned it to him.  Can you explain how that occurs?  A. When I took the bread out of the shop in the morning, I was charged the full retail price for that bread and when I came back in the evening, the bread which I had not sold was checked out again, back into the shop again and then he give me twenty per cent discount on that bread to cover my day's wages.  Q. But I cannot see why there was any necessity of making any arrangement when you were guaranteed to be paid fifteen dollars a week and could not earn any more than fifteen dollars a week.  A. Well, it seemed to come handy to pay me that way every day, because I had to stand everything that I put on the book.  I had to trust people in town and he did not stand anything.  That is the only reason I know that he did that.  Q. Then you say that you had to stand whatever you put on the book.  Did you keep an account with your customers?  A. I did.  Q. And Mr. Easton had nothing to do with that account?  A. No, sir.  Everything he sold me at the time was, he said: 'If you trust anything out, you will have to stand that loss yourself.'  Q. With that sort of an explanation, it would look like Mr. Easton simply guaranteed that

your business would amount to fifteen dollars a week, if you were charged with the bread that you took out in the morning and given credit for what you returned at night? A. Yes, sir.   Q. And you paid him for what bread you had sold during the day, and took the chance of collecting where you gave credit?   A. I took that on my own shoulders to get that money.   Q. Why should you take the chances of getting the money for bread delivered, if you were not going to make anything by it?   If you were paid fifteen dollars a week in wages, why should you extend credit and take the chances of collecting?   A. Because I was working for his interest to get rid of his bread, and the more I sold it was that much better for him, because I got the money.   I was acquainted with the people.   Q. But it was distinctly understood between you and Mr. Easton that if you extended credit to anyone, that you took the chances of collecting?   A. It was. Q. And each night you settled with Mr. Easton for the bread that you sold during the day?   A. Yes, I did, less the twenty per cent discount.   Q. And when did you settle with him then for this fifteen dollars per week?   A. At the end of the week all that this discount overrun fifteen dollars, I give back to him at the end of the week.   The discount ran up something like eighteen dollars every week that I had collected at the end of the week and I handed the balance back to him.   I mean the percentage.   Q. Did you have a lot of customers that you delivered bread to that had it charged to an account? A. There was a certain number.   I don't know just how many there were.   Q. About how much bread would you put out in the day that you did not get paid for?   A. Perhaps one dollar, something like that; perhaps not that much. Q. Did you go around afterward and collect that money? A. They paid me every week or two or three days, they would hand me some money on their account.   Q. And you kept a record of that in a book that you provided for yourself? A. I have a book at home.   Q. You have a book that you kept that in?   A. I did; yes."

He testified that at the end of each week he had to repay more or less money to Mr. Easton over and above the fifteen dollars.   He testified also that before entering into Mr. Easton's service under this arrangement, he had been distributing bread for another bakery, and also at the same time for Mr. Easton, and that at that time the arrangement was that

he was to pay outright for the bread as he took it from the bakery. "Q. When you went to work for Mr. Easton, you say that you went to work for wages? A. That is what I took to be wages. Q. You are quite sure that the arrangement was not that your profits were to be at least fifteen dollars a week after you had paid for the bread that you took out? A. No, sir, it was a guarantee. That was just the words he said: 'I will guarantee you fifteen dollars a week.' "

He testified that at the time he was working for the two bakeries above referred to, buying and selling their bread, he had no guarantee whatever. He testified that he had regular customers to whom he furnished bread under the earlier arrangement, and when he went to work for Mr. Easton under the arrangement in question, he took the same route. "Q. You had certain regular customers? A. I did. Also I delivered to some of his wholesale trade—to three different stores. Also I took out bread to some of his retail trade on the north side of the town after I came in from my route. Q. That is delivering orders that came into the shop? A. I suppose so. They were in there to be taken out and I took them out. . . . Q. So, in addition to doing the work wherein you stated you got twenty per cent for the goods sold by you, you also worked for him in delivering to the stores for him? A. I did. Q. Did you do it practically every morning? A. I would not swear to that, that I delivered it every morning, but I am almost sure I did, because after I started in I did. . . . Q. Did you receive any extra compensation over the twenty per cent? A. I did not. Q. When you delivered bread for him on his retail orders, did you receive any compensation? A. I did not."

Some slips were introduced in evidence on which are recorded in pencil, roughly, the amount of bread received daily by applicant and the amount returned for which credit was given, and showing the amount earned on that date, less twenty per cent, and as the entries are explained by the witness, they seem to corroborate his statement of the arrangement under which he was working. He testified that for the week, except on Saturday, his compensation, computed on the twenty per cent basis, ran from two dollars and forty cents up to three dollars daily. That Saturday was his best day, and on that day the balance was struck for the week. "Q. And the amount was never under fifteen dollars?

A. Not that I remember of. Q. And it usually exceeded by a few dollars fifteen dollars? A. Yes, sir. Q. That amount you returned to your employer, Mr. Easton? A. I did."

Dr. L. R. Johnson, who was the attending physician while applicant was in the hospital, testified that petitioner visited the hospital several times to see applicant and to inquire after his condition. He testified: ":Q. Did he make any statement to you as to the manner of employment or compensation or regular wages paid to this man, Mr. Sohn? A. Yes, he told me that he worked on commission." Objection was made to the question on the ground that it was a question of law, but it was claimed to be admissible as a statement made by the petitioner himself. "Mr. Dodge (Attorney for Petitioner): As far as it is a question of law, it is objected to. Referee: You will answer the question. A. He told me that he worked for him under a commission. I don't know as I can remember the exact conversation, but it seemed to be Mr. Easton's idea that it was a commission basis. It was something about his furnishing the horse and wagon, etc. Q. Did he speak to you about guaranteeing him a certain compensation per week? A. No, Mr. Sohn told me that. Q. Did he speak to you about having sent Mr. Sohn to the St. Joseph's Hospital? A. No, I don't think so. I think he said that if he was responsible, he would pay the bills and if not, he would not. So he seemed very kindly disposed toward him and he seemed inclined to help him and he was solicitous about it. He did not offer to pay the bills unless he was held for it by the commission. That is the way I understood him."

On his cross-examination, applicant testified that he started out in the morning whenever he got loaded up and went out on his old route and Mr. Easton did not authorize him to go in any particular way; that he came back whenever he pleased after going over his route and sold bread to whomsoever he wished to and Easton credited him with all bread returned.

Easton's testimony was in effect that Sohn came to him and said he wanted to purchase his, witness', goods and go out and sell them, and that the arrangement made was that Easton was to give Sohn "twenty per cent on the retail price and five per cent on the wholesale stuff." He denied that he had guaranteed Sohn fifteen dollars per week while he was working; denied that he had ever said anything to Sohn

about wages; that the arrangement "was strictly a buying or selling or a commission matter between" him and Sohn.

The fact that Sohn chose his own time to go out and return and was not directed by petitioner where to go or to whom to sell has some probative force but is not conclusive of the relation which actually existed, nor is it inconsistent with the claim that the relation was that of employer and employee. The same may be said of the arrangement by which the applicant was to be compensated for his services. The circumstance that these services were to be measured by a per cent of the retail price of the bread sold did not "create a distinct relationship in law" (*Cameron* v. *Pillsbury,* 173 Cal. 83, [159 Pac. 149]; *Brown* v. *Industrial Accident Commission,* 174 Cal. 457, [163 Pac. 664]); and while in the cases cited there were other circumstances tending to establish the relation, the principle was announced that the fact of compensation being fixed by the amount of the goods or lots sold did not in itself create the relationship of independent contractor.

As was said in *Cameron* v. *Pillsbury, supra:* "It is not an uncommon thing for retail merchants, for laundrymen, and the like to pay a commission to the drivers of their delivery wagons for all new business which they bring in. It has never been held that this circumstance creates a distinct relationship in law." Paying for services by a commission is frequently but a means of admeasuring compensation. We must in the present case assume as the fact, for applicant so testified, that he was to receive and was guaranteed fifteen dollars per week for his services. It appeared by the testimony of applicant that he performed duties other than of selling the bread; that he, by direction of petitioner, delivered bread to the latter's wholesale customers and to some of his retail customers which, while part of the services rendered, were not compensated except by the payment of the fifteen dollars per week wage.

Applicant had previously performed for petitioner this same kind of service and petitioner knew what he could do and applicant knew what was expected of him in order to earn the promised wage. It is fair to assume, and the evidence warrants the assumption, that, while petitioner did not direct applicant in the performance of the service, it was mutually understood that applicant surrendered his entire

time to the service being performed.  It is not reasonable to suppose that petitioner would guarantee payment of fifteen dollars per week on any other assumption.

It is contended that the terms "employer" and "employee," as defined by sections 13 and 14 of the act, and as held by the commission in *McCoy* v. *Kilpatrick,* volume 1, page 601, of the Industrial Accident Commission Reports, import the relation of master and servant, and that the evidence herein does not measure up to the definition of the terms "master" and "servant," as defined by section 2009 of the Civil Code, which reads as follows: "A servant is one who is employed to render personal service to his employer, otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter, who is called his master."  Beyond dispute, Sohn was employed to render personal service to his employer in undertaking to sell his employer's bread for a fixed compensation per week.  Just why the bread was billed to him at retail prices and a weekly settlement was made is not fully explained.  It might have well been for the purpose of finding whether Sohn was earning daily or weekly the pay guaranteed and thus to determine whether it was a profitable arrangement for the master.  We do not think the section of the code, in applying it to the administration of the Workmen's Compensation Act, should be construed to mean that Sohn was not a servant because his master did not specifically control his movements in making sales of the bread.  Sohn was not only to receive the bread and sell it but was to report daily and turn in any earnings in excess of two dollars and fifty cents per day, which was the daily pay at fifteen dollars per week of six working days, and he was to report Saturday night and settle up for the week's sales and to receive whatever was due of his weekly wage of fifteen dollars.  In the course of this particular service he was also to make deliveries to wholesale customers and to retail customers who made purchase at petitioner's store.

We think the evidence sufficient to justify the findings and to show that the relation existing between petitioner and applicant was that of employer and employee.

The award is affirmed.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 11, 1917.