[Civ. No. 3065.   Fourth Dist.   Nov. 10, 1942.]

STEWART & NUSS, INC. (a Corporation) et al., Petitioners, v.   INDUSTRIAL   ACCIDENT   COMMISSION   and ARTHUR W. TRUMAN et al., Respondents.

502

R. P. Wisecarver for Petitioners.

Everett A. Corten, J. Gould and Keith, Creede & Leonard for Respondents.

BARNARD, P. J.—The petitioners seek, insofar as they are concerned, to annul an award of the Industrial Accident Commission in favor of Arthur W. Truman, who was injured on November 11, 1941, while assisting in moving a dragline shovel from a sand pit to a flying field at Lemoore. The commission found that Truman was injured while employed as a dragline operator by two persons doing business under the name of Dragline Rentals Company and their agent B. W. Kuhn as general employers, and by Stewart & Nuss, Inc., as his special employer. The award has become final as to the general employers, but it is here attacked by Stewart & Nuss, Inc., and their insurance carrier on the ground that Truman was solely an employee of Dragline Rentals Company, an independent contractor, and that there is no evidence to support the finding that Stewart & Nuss, Inc., was his special employer at the time in question.

The general facts may be briefly stated as follows: The Pacific Rock & Gravel Company had a contract with the federal government for the surfacing and construction of a flying field at Lemoore. On September 25, 1941, Stewart & Nuss, Inc., entered into a subcontract for the sale and delivery of certain rock, sand and gravel to be used in this work. Stewart & Nuss, Inc., then entered into a subcontract with Dragline Rentals Company which provided that the Dragline Rentals Company would, at its own expense, install a model 95 dragline shovel at a certain sand pit, and excavate the sand and load it on trucks to be supplied by Stewart & Nuss, Inc.; that Dragline Rentals Company was to receive nine cents for each cubic yard of sand excavated and loaded; that Dragline Rentals Company would at its own expense provide workmen's compensation insurance covering its employees engaged in the work under the contract; that Stewart & Nuss, Inc., would advance each week to the Dragline Rentals Company

an amount equal to that company's payroll directly incurred in these operations, such advancement to be deducted from any sums to become due the Dragline Rentals Company; and that at a later date the Dragline Rentals Company would at its own expense move the model 95 dragline shovel from the pit to the flying field and there operate it in connection with the unloading and moving of rock and gravel, and at the same time replace it with another machine at the sand pit.

At the time this contract was executed the model 95 dragline was being overhauled at Friant Dam by the respondent Truman and a man named Hawley. These men had been hired by Kuhn under some arrangement with Dragline Rentals Company. Shortly after the contract was executed the dragline was moved on a truck owned by the Bellyea Company from Friant Dam to this sand pit where it was put in operation, Truman acting as operator and Hawley as oiler. It appears that Dragline Rentals Company had theretofore rented out their machines and that this was the first time it had undertaken to itself operate a machine on such a contract. That company had a number of machines in operation at various places throughout the state and Kuhn, under some arrangement with it, traveled around looking after these various machines. As a result, he visited the sand pit here in question only occasionally.

Stewart & Nuss, Inc., kept a man at the sand pit to check the loads of gravel as they were loaded and also furnished a man with a bulldozer to strip off the top surface so that the sand might be excavated. Its foreman, a man named Jellick, visited the sand pit several times a day and regulated the flow of sand as it was needed at the flying field. The work under this contract was coordinated with the work under various other contracts, all under the general supervision of an army engineer. At times the dragline shovel was not operated, due to rains or to the fact that sand had been arriving at the air field faster than it could be used. During one stoppage Stewart & Nuss' foreman asked Truman to start the machine and load three or four trucks with sand which was needed in connection with a pipe line at the air field which Stewart & Nuss, Inc., were laying under a separate contract. About the same time Truman used the dragline to rescue one of the trucks which had become bogged down. When Truman complained of the delays Stewart & Nuss'

foreman, by way of recompense for rescuing the truck and loading the three or four trucks for the other purpose, put Truman and Hawley on the Stewart & Nuss, Inc., payroll for the pipe line contract for one day's work and paid them therefor. On another occasion, when Truman shut down operations on the dragline shovel because, as he said, sufficient trucks were not furnished to keep such a large machine busy, he was induced to restart operations by Stewart & Nuss., Inc., who promised to furnish more trucks.

On or about October 25, 1941, Kuhn appeared at the sand pit and Truman asked him when he was going to get some pay. Kuhn testified that up to then he had forgotten to take out compensation insurance, that he thought because they only had two men on the shovel these men might as well be carried on the Stewart & Nuss, Inc., payroll, that he told this to Truman and later told the Stewart & Nuss, Inc., foreman that he had no compensation insurance. This was denied by Truman and Jellick. In any event, Kuhn then sent Truman to Stewart with a signed note which read: ''Please give to Mr. Art Truman the sum of $415 which is the amount due him and his oiler on Lemoore job.'' Truman went to Mr. Stewart, who instructed his bookkeeper to give Truman a check saying that they were to advance an amount sufficient to cover the payroll in accordance with the contract. The bookkeeper gave Truman a check for $415 and took a receipt for the $415 ''for shovel operator and oiler payrolls to October 25, 1941.'' The bookkeeper told Truman that it would be necessary for him to bring in itemized statements showing what the $415 was for, as these were needed in obtaining advances from the general contractor and in showing what had been done on the job. The bookkeeper gave Truman a half dozen printed forms which were used by Stewart & Nuss, Inc., as time sheets in making up their payrolls. These statements were not filled out and returned by Truman in connection with the $415 first paid him, but at the end of each of the next two weeks Truman brought into Stewart & Nuss' office a time sheet made out on one of these forms. The heading ''Stewart & Nuss, Inc.'' was left unchanged, and under the heading ''Employee'' these time sheets listed Truman and Hawley, giving the number of hours worked on respective days, the total hours worked, the rate per hour, and the amount of deductions for unemployment insurance and old age benefits, respectively, for each of the two men. Checks

for the balance, after these deductions, were given by Stewart & Nuss, Inc., directly to these men and the amount of the deductions were still in the hands of Stewart & Nuss, Inc., at the time of the hearing, its intention being to turn these amounts over to Dragline Rentals Company, for payment to the government, on a final settlement under the contract.

A few days before November 11, 1941, it was decided to move the model 95 dragline shovel from the sand pit to the flying field as provided for in the contract. About that time Kuhn told Mr. Rogers of the Pacific Rock & Gravel Company, the general contractors, that he intended to "walk" the dragline shovel to the flying field under its own power. Rogers told him he thought the highway authorities would not permit this. Kuhn then asked Rogers to see if he could get permission for this. About this time someone arranged with a truckman named Brown to move the machine, but it does not clearly appear who did this. On November 10, Truman asked Jellick to find out from Rogers when the shovel was to be moved. When Jellick asked Rogers for this information Rogers tried to get a permit from the highway department for Brown to move this machine, but permission was refused because the Brown truck was too small. After they had made a number of telephone calls about the matter, Rogers telephoned to the Bellyea Company in Los Angeles and arranged to have that company send up a large truck that night with which to move the shovel on Armistice Day, permission for this having been granted by the highway department. The next morning the Bellyea truck had not arrived and Truman went to the flying field to see what the trouble was. Rogers then telephoned to Kuhn at Glendale, told him he had ordered the truck in his behalf and asked him to contact the Bellyea people. Kuhn did so, and reported that the truck was on its way. Later in the day the truck arrived at the sand pit and Truman supervised the placing of the shovel on the truck, and while he was assisting in moving it down the highway the shovel boom caught on some high tension wires. Truman climbed up on the boom and was injured while attempting to force the boom under the wires.

It would seem from the record that Kuhn, who had forgotten to get compensation insurance, decided at the time Truman asked him for his pay to attempt to get the two employees of the Dragline Rentals Company placed directly

on the payroll of Stewart & Nuss, Inc. He testified to the effect that he thought this had been arranged when he later inquired of Truman about the matter and was informed by Truman that he was getting his pay checks from Stewart & Nuss, Inc. While this was denied by the other witnesses it is merely another of the existing conflicts. While the contract provided very clearly that the Dragline Rentals Company was to operate the shovel and move the shovel at its own expense and that Stewart & Nuss, Inc., were merely to advance funds as they might be needed to meet the Dragline Company's payroll, and while it may well be that Stewart & Nuss, Inc., intended to proceed in accordance with the terms of the contract and did not enter into any clear-cut and definite agreement to change the terms thereof, a part of the evidence, with the reasonable inferences therefrom, supports the conclusion that Stewart & Nuss, Inc., in their zeal to keep the work going and possibly because of the absence of Kuhn from the scene of the operations during most of the time, did many things which were not strictly in accordance with the terms of the contract and that it actually assumed and exercised a measure of control which must be held to have modified the terms of the contract, so far as material here. As was said in *Luckie* v. *Diamond Coal Co.*, 41 Cal.App. 468 [183 P. 178] : "Accordingly, it has been held that, in an action of this character, while *prima facie,* the relation of the parties to a written contract of employment is that which is expressed by the terms of their writing, nevertheless, in order to determine their true relation, such contract should be construed in view, not only of the circumstances under which it was made, but of the conduct of the parties while the work is being performed."

It is well settled that in industrial accident cases an employee may at the same time be under a general and special employer. (*Independence Indemnity Co.* v. *Industrial Acc. Com.*, 203 Cal. 51 [262 P. 757] ; *Department of Water & Power* v. *Industrial Acc. Com.*, 220 Cal. 638 [32 P.2d 354].) In the first of the cases just cited, the court said: "The authorities would seem to indicate, however, that for liability to attach to the special employer the injured person must have been at the time of the accident subject to the direction and control of such special employer, for it is this right to control and direct the activities of the employee that gives rise to the status of special employer." In *Stacey Bros. G.*

*Const. Co.* v. *Industrial Acc. Com.*, 197 Cal. 164 [239 P. 1072], it is said that "the real test of what constitutes special employment may be said to be found in the character of the control and supervision exercised by the alleged special employer over the work and the employee engaged in the doing of the same." In *Entremont* v. *Whitsell*, 13 Cal.2d 290 [89 P.2d 392], in speaking of these two cases, the court said: "These last two cases recognized that where the special employer exercises some measure of control comparable to the control here involved, an injured employee under the Workmen's Compensation Act can secure an award against both his special and general employer."

While recognizing these general rules, the petitioners argue that Stewart & Nuss, Inc., and its foreman acted merely as messengers in transmitting to Truman suggestions and information relating to the progress of the work in general and the wishes of the general contractors and government engineers, and the times at which sand could be delivered under the weather conditions and as governed by the progress of the work, that such orders as were given were such as are usually given to an independent contractor, being orders which affect the result only and not the methods by which such results are reached, and that no orders were given which indicate any authoritative control. Also, that nothing appears in connection with the circumstances under which money was paid to Truman by Stewart & Nuss, Inc., which indicates anything other than a mere advancement of the payroll, which of itself cannot create an employment relationship. While a part of the evidence sustains these contentions there are other portions which support a contrary view and which, in our opinion, reduce the matter to a question of fact with the evidence sufficiently sustaining the finding which is attacked.

Truman testified that no one had ever told him that in operating the equipment at the sand pit he was working for Dragline Rentals Company; that he assumed that he was working for Stewart & Nuss, Inc.; that he received his orders from and was paid by it; that Kuhn told him he was to receive $2 per hour, which would be paid by Stewart & Nuss, Inc.; that Kuhn never told him that he was to be in charge of the work or that he was to stop working if Stewart & Nuss failed to furnish enough trucks; that Jellick, superintendent

for Stewart & Nuss, Inc., was at the sand pit daily; that Jellick told him "how deep and how wide (to excavate) and when I would have the trucks and what hours to start and what hours to stop"; that in bad weather Jellick told him not to operate; that Jellick would have his bulldozer strip off a part of the land and told him to work where the overburden was stripped off; that Jellick would tell him to stay out of the clay and not to go too deep where the sand was wet; that if he did not get the material desired Jellick would tell him just what he wanted; that Jellick was there several times a day and that he would "give me orders, line me out and then leave and come back"; that Jellick was the only one out there who gave him orders; that when he asked Kuhn about his pay Kuhn told him to go to Stewart & Nuss for his time and gave him a written order; that he did not make out a time sheet in connection with the $415 which he received the first time, but that later on two occasions he made out time sheets on Stewart & Nuss' forms, the way they told him to make them out and showing deductions for his unemployment insurance and old age benefits; that he put his social security number on his time sheets and on each of the two occasions received a check for the net amount due him, which he cashed; that no one else gave him orders on this job except Stewart & Nuss; and that Jellick told him to be ready to move the machine to the flying field and later came back and told him when to move it.

Charles Stewart, president of Stewart & Nuss, Inc., testified that on one occasion when the work had stopped "I told Jellick over the phone to tell Truman to put the dragline to work as we had to move sand"; that the last two checks which were given to Truman by Stewart & Nuss, Inc., were handled like the checks which were issued by Stewart & Nuss, Inc., to their regular employees on that job; and that after this accident subsequent advances which were made to Kuhn or the Dragline Rentals Company were made in lump-sum checks to that company and not by payroll checks to the individuals working on the dragline. Jellick testified that on one occasion when the operation of the dragline shovel had been stopped he told Truman to restart the work; that on November 10 Truman asked him to find out when Brown was coming to move the machine and that after Rogers made some phone calls he conveyed word to Truman that the Bellyea truck would be there the next morning; and that the drag-

line shovel was being moved to the air field at the time of the accident for the purpose of continuing operations under the Stewart & Nuss, Inc., contract with the Dragline Rentals Company. Rogers testified that he and Jellick helped arrange for the moving of the machine to the air field and that he told the Bellyea Company that it was to be done for Kuhn.

This evidence discloses the giving of orders which amount to something more than a mere interest in the results to be accomplished and is sufficient, we think, to bring this case within the rules governing a special employee. The manner in which the payments to Truman were handled prior to the accident, while it may not be controlling, is quite suggestive and further supports the conclusions reached by the commission on the main issue.

The petitioners further argue that Truman was injured while the dragline shovel was being moved to its new location, that under the contract this moving was to be done by the Dragline Rentals Company, and that Stewart & Nuss, Inc., were in no way interested in the moving of that machine and did not exercise the slightest control in connection therewith. It appears from the evidence that Stewart & Nuss, Inc., took a not inconsiderable part in arranging for the moving of the machine. In view of the situation which then prevailed, as outlined above, this part of the performance of the contract cannot be segregated from the other portions, and the evidence affecting Truman's relationship as a special employee of Stewart & Nuss, Inc., is applicable to the situation which prevailed during the time the machine was being moved as well as to that immediately prior thereto. The facts in this connection and the activity of Stewart & Nuss, Inc., in the arrangements for the removal of the machine were all to be considered by the finder of fact. In our opinion, there is sufficient evidence to support the finding that Truman was at the time in question a special employee of Stewart & Nuss, Inc.

The award is affirmed.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing was denied December 10, 1942, and petitioners' application for a hearing by the Supreme Court was denied January 7, 1943.