[L. A. No. 18582. In Bank. Apr. 30, 1943.]

WINIFRED E. BURLINGHAM et al., Appellants, v. JOHN W. GRAY et al., Respondents.

Doróthy Thompson and Raymond Thompson for Appellants.

Blodget & Tobias for Respondents.

SCHAUER, J.—This is an action for damages for the wrongful death of Wade Earl Burlingham, caused by injuries sustained in the collision of an automobile driven by the defendant John W. Gray and a motorcycle operated by the decedent. The sole question to be determined is whether the trial court was or was not justified in holding that as a matter of law under the evidence the defendant John W. Gray was not an employee of defendant Stockholders Publishing Company on the date of the collision and in withdrawing that issue from the jury. We have concluded that the question should have gone to the jury.

The case comes to us on appeal by plaintiffs from the judgment entered upon a directed verdict against them and in favor of defendant Stockholders Publishing Company. Defendants John W. Gray, Lewis R. Gray, Alice D. Gray, and Stanley C. Porter filed separate notices of appeal from a judgment on a verdict found by the jury against them and in favor of plaintiffs. The appealing defendants, however, after due notice to them, have failed to pay the required filing fee on appeal, and have filed no briefs or points and authorities; therefore, their incipient appeals will be dismissed (see rule 5 for Rules for the Supreme Court and District Courts of Appeal).

Plaintiff Winifred E. Burlingham is the widow and the other plaintiffs are the parents of the decedent Wade Earl Burlingham. At the date of the collision, January 1, 1941, John W. Gray (the driver of the automobile) was nineteen years of age. Defendants Lewis R. Gray and Alice D. Gray

are the parents of John, and are sued as signers of the application for his operator's license. Defendants Stanley C. Porter and Stockholders Publishing Company are alleged in the complaint (amended) to have been the employers of John W. Gray in the business upon which the latter was engaged at the time of the accident. Evidence as to the fault of the two persons involved in the collision has been omitted from the transcript by stipulation, and, as previously mentioned, the only issue before us is the sufficiency of the evidence as to the character of the relationship between the defendant Stockholders Publishing Company on the one hand and Porter and Gray on the other.

The evidence shows that at the date of the accident the defendant Stockholders Publishing Company (hereinafter referred to as "the company") was the publisher, and defendant Porter a distributor (in a portion of Orange County) of a newspaper known as "The News." Defendant John W. Gray was one of the carrier boys employed by Porter to deliver copies of The News in the latter's territory, and was paid by Porter therefor the sum of $50 per month, "plus bonuses if his circulation went up." A written contract between Porter and the company, dated November 15, 1937, contains the following provisions, among others:

" . . . the Dealer [Porter] . . . agrees:
"Section 1.
"What the Dealer Will Do

"1. To use his earnest and conscientious effort to promote the circulation of . . . [The News] by frequent and thorough canvasses among the inhabitants of his district, and by frequent distribution and display of such advertising matter concerning . . . [The News] as may from time to time be sent to the Dealer by the Company.

"2. To sell . . . [The News] to regular subscribers and to transient buyers of his district at prices fixed by the Company, the Dealer's profit to consist of the difference between the retail price of said newspapers fixed by the Company and the wholesale price thereof also fixed by the Company.

"3. To sell copies . . . to sub-newsdealers, distributors and circulators at prices fixed by the Company, the Dealer's profit to consist of the difference between the wholesale rate at which copies of said newspaper are sold to him and the rate

fixed by the Company for sale of such copies to sub-news-dealers, distributors and circulators.

"4. To pay his bills promptly on or before the tenth (10th) day of each month for all papers furnished to the Dealer by the Company during the preceding month, regardless of whether or not the Dealer may have collected the amounts due from subscribers, sub-newsdealers, distributors, circulators and all others for such newspapers, and to assume no credit for unsold copies or make any deductions whatsoever without the written consent of the Company.

"5. To pay promptly all bills for supplies, prizes or other merchandise, commonly used in connection with circulation methods, furnished by the Company to him.

"6. To furnish a bond or security satisfactory to the Company in such sum as may be designated by the Company to secure the payment of all sums that may be due to the Company from Dealer hereunder, and also at the option of the Company.

"7. To maintain an accurate and up-to-date list of subscribers and their addresses, and to furnish such list to the Company or its representative, at its request, and to no other person, firm or corporation without the written consent of the Company.

"8. To act as dealer . . . within the territory as assigned to him by the Company, and to be responsible for his own acts and of his substitutes and subordinates during the life of this agreement. *The Dealer hereby declares that he is engaged in an independent business,* and that he personally hires and pays all persons assisting him in the distribution of said newspapers and in the collection of all money therefor in the district aforesaid, and has sole and exclusive control over his said employes. The Dealer hereby agrees that the Company shall not in any event be liable for any loss, damage or injury to the person or property of the Dealer, or to the person or property of any of his employes, or to the person or property of any of the public, and the Dealer does hereby indemnify and save the Company harmless from any and all damage or liability whatever for or on account of any such loss, damage or injury.

"9. It is understood that a bonus of any amount paid by the Company to the Dealer may be adjusted as the Company sees fit, . . .

"Section 2
"What the Dealer Will Not Do

"1. Not to permit any third person . . . to stamp any advertising matter on copies of . . . [The News] before delivery to subscribers, . . . or others, and not to permit the insertion of circulars or other advertising matter for distribution with . . . [The News] excepting those which are sent to the Dealer by the Company.

"2. Not to assign or transfer this agreement or any rights thereunder or any interest therein. Any attempted assignment hereof shall give the Company the right to terminate this agreement.

" . . . the Company . . . agrees:
"Section 3
"What the Company will Do

"1. To furnish the Dealer with copies of . . . [The News] at prevailing wholesale prices fixed by the Company, subject to the provisions of paragraph 1 of Section 4 hereof.

" . . . it is further agreed and understood . . . :
"Section 4
"How the Company May Terminate this Agreement

"1. That the Company may without notice and when necessary suspend this agreement in case of . . . change in the retail or wholesale prices of . . . [The News]; or may, at any time for violation by the Dealer of any part of this agreement; or *may cancel this agreement at any time, if in the opinion of the Company the Dealer is incapable or unsatisfactory in any manner,* or is responsible through neglect or inattention to business of causing the Company's circulation in said district to decrease. . . .

"Section 5
"How the Dealer May Terminate this Agreement

"1. The Dealer may withdraw from this agreement, provided he does each and all of the following:

"(a) Gives the Company at least thirty (30) days' notice in writing of his intention to withdraw; (b) Furnishes the Company with a complete list of subscribers' names, dates to which subscriptions are paid, addresses and places of de-

livery of . . . [The News], and (c) pays the Company in full for all newspapers theretofore supplied to him, and turns in to the company all money collected in advance from subscribers.

*"It is mutually understood and agreed that the Company may suspend, terminate or cancel this agreement at any time without notice to the Dealer, for any of the reasons or causes or upon any of the grounds mentioned and referred to in paragraph 1 of Section 4 hereof. . . ."* (Italics added.)

Under what counsel for each of the respective parties states to be a separate oral agreement between Porter and the company, Porter was paid $2.00 per week (less social security deductions) by means of a regular payroll check of the company, for picking up a bundle of papers at Anaheim and taking it to Orange to the Orange agent. At the time of the accident defendant John W. Gray was engaged in delivering copies of The News to subscribers and was also carrying and "on his way to deliver" the extra bundle of papers.

Plaintiffs' contentions are four:

1. The written contract in the instant case, although similar in many respects to the contracts in the cases of *Bohanon* v. *James McClatchy Pub. Co.* (1936), 16 Cal.App.2d 188 [60 P.2d 510], and *Batt* v. *San Diego Sun Pub. Co., Ltd.* (1937), 21 Cal.App.2d 429 [69 P.2d 216], nevertheless contains some provisions which show that the company had "the power to control the means of obtaining the result," and therefore was the employer of Porter and Gray.

2. Although "The written contract between Porter and the Publishing Company is drawn with the evident purpose of creating the appearance [and, doubtless, the actuality] of an independent contractor relationship," nevertheless, under doctrine declared in *Luckie* v. *Diamond Coal Co.* (1919), 41 Cal.App. 468, 478 [183 P. 178] (see, also, *Brown* v. *Industrial Acc. Com.* (1917), 174 Cal. 457, 460 [163 P. 664]; *Stewart & Nuss* v. *Industrial Acc. Com.* (1942), 55 Cal.App. 2d 501, 506 [130 P.2d 985]) the conduct of the parties in execution of the contract may be relied upon by persons not parties to the contract, such as plaintiffs here, as showing that the true relationship between the parties was that of employee-employer. In *Luckie* v. *Diamond Coal Co.*, it is stated, at page 478 of 41 Cal.App., that "Strangers to . . . [a] contract are at liberty to show that the written instru-

ment does not disclose the full or true character of the relation between the contracting parties. . . . Accordingly, it has been held that, in an action of this character, while, *prima facie,* the relation of the parties to a written contract of employment is that which is expressed by the terms of their writing, nevertheless, in order to determine their true relation, such contract should be considered in view, not only of the circumstances under which it was made, but of the conduct of the parties while the work is being performed. [Citation.]''

3. Regardless of Porter's status under the written contract he was an employee of the company in transporting the extra bundle of papers from Anaheim to Orange.

4. Negligence on the part of defendant John W. Gray as Porter's ''authorized assistant'' under both the written and the oral contracts, renders the company liable.

█ A court may direct a verdict only when, disregarding conflicting evidence and giving plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn therefrom, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff. (*Estate of Lances* (1932), 216 Cal. 397, 400 [14 P.2d 768]; *Estate of Flood* (1933), 217 Cal. 763, 768 [21 P.2d 579]; *Curcic* v. *Nelson Display Co.* (1937), 19 Cal.App.2d 46, 49-50 [64 P.2d 1153].) We are of the opinion that the evidence is ample to sustain a verdict in favor of plaintiffs and that it was error resulting in a miscarriage of justice (Cal. Const., art. VI, § 4½) for the trial court to direct a verdict in favor of the company.

In a recent case (*S. A. Gerrard Co.* v. *Industrial Acc. Com.* (1941), 17 Cal.2d 411, 413 [110 P.2d 377]) this court had occasion to distinguish the relationship of an independent contractor from that of an employee, to the employer. It said, speaking through Mr. Justice Edmonds: ''An independent contractor is 'one who renders service in the course of an independent employment or occupation, following his employer's desires only in the results of the work, and not the means whereby it is to be accomplished.' [Citations.] On the other hand, the relationship of master and servant or employer and employee exists whenever the employer retains the right to direct how the work shall be done as well as the result to be accomplished. [Citations.] But this rule requires that the right to exercise complete or authoritative

control, rather than mere suggestion as to detail, must be shown. [Citations.] Also, the right to control, rather than the amount of control which was exercised, is the determinative factor.'' And with reference to the subordinate in that case, the court aptly said (at page 414): ''In form he was an independent contractor; in effect he was an employee. . . .'' Hence it becomes necessary to carry our scrutiny beyond the form of the contract between the publishing company and Porter.

Porter testified that at the time he took over the agency for The News he was told by the representative or ''road man'' of the company that he (Porter) ''would be responsible for Santa Ana, and the growth of the circulation in that territory,'' and that ''the papers should be delivered by 6:00 o'clock in the evening, and the best service possible,'' meaning ''porch service,'' should be given; that thereafter the road man called upon him three or four times a year, generally asking ''if I have any idea as to building up the circulation, and how we are getting along''; that ''at times he [the road man] has contests in circular form, and he either mails them out to me, or brings them down personally and tells me to have the boys work on contests such as Catalina trips and trips to get subscriptions''; that the prizes for such contests were presented by the company to the carriers; *that the witness had never declined to carry out the suggested contests;* that at other times the company had furnished him with metal newsstands for the papers and suggested that he put them on the street corners, *which he did;* that the company told him ''to put papers in the window'' *and he did so;* that the company sometimes gave him sample copies of The News which he was to deliver free for a time, and *he always complied with its suggestions* in this respect; that occasionally he had been told he could ''take my carriers out in soliciting crews from door to door and canvass prospects,'' and on such occasions *he always did so;* that on other occasions the company had sent a crew of solicitors to the witness' house and he was ''instructed to give them territories to work which would benefit both myself and The News to the best extent,'' *which he did;* that such solicitors were paid by the company and their pay was not charged to the witness; that at the suggestion of the circulation manager he attended meetings at the Los Angeles office, and at the last meeting ''we were told there would be an insurance policy to be sold along with

The News, and our cooperation would be appreciated in building business, both the circulation and the insurance policy and the paper"; that *he complied with that request;* that the company told him to give good service and early service, and suggested that he get all of the papers delivered before 6:00 in the evening and before 7:00 in the morning; that he "had" to buy his receipt and collection forms from the company; that pursuant to written instructions from the company he had "to keep my own records, my own books, and twice a year I have to turn in a list and addresses of all the subscribers in my territory, in books that are furnished by The News"; that he divided his territory into such carrier routes as he saw fit, and made changes from time to time at his own "convenience," merely keeping the company informed of his actions in this regard; that as the "result" of "conversation" he had had with company representatives and of "the union contract" he was allowed a two weeks' vacation "with pay"; that the company furnished a substitute for Porter during the latter's vacation period and paid such substitute "$35.00 or $37.50 each week"; that Porter's "earnings" including the $2.00 check continued during his vacation; that he could take longer than two weeks if he asked to do so, but the company would pay a substitute for only two weeks; that he had no right to sell his agency for The News; that "When I took over the Anaheim agency, the Anaheim agent had tried to sell it to me, and I got in touch with the road man, and he said 'Well, they aren't for sale, that The News replaces the man,' and it was given to me for a cash buy," the cash being paid to The News; that he was told at that time it "would be the same situation" when he disposed of his route; that he purchased the newspapers from the company at a *price fixed by the company* and resold them to his carrier boys at a profit; that the company *also fixed the retail price* paid by subscribers, although the witness could charge the carriers whatever price he wished; that in addition to his compensation from the purchase and sale of newspapers, he received each week from the company its regular payroll check in the sum of $1.96, representing the payment of $2.00 less social security deductions, for "picking up [a] bundle [of newspapers] at Anaheim, and taking it to the Orange agent, re-spotting it for the Orange agent"; that such payroll check had "nothing to do with the purchase and sale of the newspapers that are covered by the written contract"; that he could select his

own method of delivery of the bundle to Orange and that he delivered it or had someone else do so.

Porter also testified that the road man had given him a booklet entitled "Announcing a New Group Hospitalization and Surgical Plan for Employees of The News, Los Angeles, California," together with an application to participate in such plan "all ready for me to sign"; that he (Porter) "took it out the day it was given to me," and since then had "paid premiums on the plan." The booklet announcing the plan was addressed "To Our Employees:" and stated, among other things, that "Stockholders Publishing Co., Inc., has completed arrangements with . . . [a named insurance company] to provide group hospitalization and surgical insurance for the benefit of its employees. As in the case of group insurance, Stockholders Publishing Co., Inc. has agreed to pay a substantial portion of the premium. This insurance will be available to all full time employees whose names appear on the company's payroll, regardless of age or sex, and without medical examination, at a cost to the employee of only 23c per week."

While Porter was on the witness stand, plaintiffs' counsel showed him a copy of an instrument entitled "Contract, Los Angeles Newspaper Guild and The News of Los Angeles." Porter testified that this copy had been mailed to him by the Los Angeles Newspaper Guild, but that he had never seen the original contract. Demand that the original be produced was then made by plaintiffs' counsel upon counsel for the company. The latter said that he had no such contract, and the court stated it was "too late" to issue "a notice to produce, or a *subpoena duces tecum* on the company." No further proceedings were taken toward production of the original of the purported contract. Porter, however, testified that he received through the mail, from The News, "a paper marked 'Designation of Beneficiary' " together with "either two or three other copies, and I was to sign the other two or three and mail one and keep this copy for myself"; that he mailed the duplicate back to The News. The "Designation of Beneficiary" provides, among other things, that: "The undersigned, an employee of Stockholders Publishing Company, Inc., in accordance with Section 14, Subdivision 4 of that certain contract dated the 30th day of September, 1940, between Stockholders Publishing Company, Inc., (hereinafter referred to as the 'Employer') and the Los Angeles

98

Newspaper Guild (hereinafter referred to as the 'Guild'), hereby designates . . . [beneficiary named] as beneficiary of the undersigned, to receive and accept such sum or sums of money as may be due or may become due to the undersigned, under the terms of said contract . . . ." and is signed "Stanley C. Porter, Employee."

Porter testified further that he employed fifteen to twenty "assistants" or carriers in the work of distributing The News; that the company knew of such fact, and that at the close of each month he was required by the company to turn in an "earnings report" showing the carriers that had worked for him during the past month; that he had informed the company that he was not carrying the package to Orange himself; that John W. Gray had gone to work as a carrier about December 1, 1940; that the previous week Gray had applied for a route and Porter had told him "the direction of the route, the territory where the route lay," and had asked him "how he would be able to do the work" inasmuch as the route was fifty miles long, and Gray "said he had a car"; that Porter told Gray "the duties of the route" and that "as long as he fulfilled those duties, that the job would be his, and if he fell down on them, why I would have to replace him"; that Gray's predecessor on the route showed Gray the route; that Porter had had no occasion to give Gray further instructions; that he told Gray "he would receive a guarantee of $50, and if he built his route up over 160 papers, he would receive ten cents per subscriber additional, and ten per cent if he did the collecting"; that at the time of the accident here involved Gray was on his way to deliver the bundle to Orange, and after the accident Porter got the bundle from Gray's wrecked car and delivered it himself.

John W. Gray testified that Porter had arranged for him (Gray) to take over a carrier route; that Porter told him the general route and when to go to work and that he was to go to Anaheim and pick up the papers, and "told me where they would be left, and he said they would all be for Santa Ana except one bundle which I was to deliver at Orange, and he told me where to leave them in Garden Grove and various places of that nature, in the racks"; that he had no instruction as to when to complete work each day or as to how to deliver the bundle to Orange, except that he was to "take it and leave it at a certain place . . . by a certain time"; that he provided his own transportation; that he was

not told that he could not have someone else deliver the papers for him; that the only other person with whom he discussed the work was the former carrier, who showed him the route; that written instructions were sent to him by the Los Angeles office of the company, enclosed in envelopes attached to the bundles for the subscribers and stating ''which ones wanted to stop, and things of that nature''; that at times the witness ''got mail for Mr. Porter in that way and I was to leave it at his place''; that Porter told him ''when I knew the various territories, he told me to take the subscriptions and the kicks out of the envelope and leave them in Santa Ana for the various carriers of the papers'' and that he (Gray) kept those which were for his own route.

Upon this evidence the trial court left to the jury the question of the relationship existing between Porter and Gray, i.e., whether Gray was Porter's employee or was an independent contractor, but ruled that as a matter of law Porter was an independent contractor in all his dealings with the company and that Gray had no employment relationship with the company.

As indicated in *S. A. Gerrard Co.* v. *Industrial Acc. Com.* (1941), *supra,* 17 Cal.2d 411, 413 [110 P.2d 377], the determination of whether the status of an employee or of an independent contractor exists is governed primarily by the right of control which rests in the employer, rather than by his actual exercise of control. (See, also, *Robinson* v. *George* (1940), 16 Cal.2d 238, 244 [105 P.2d 914]; *Press Pub. Co.* v. *Industrial Acc. Com.* (1922), 190 Cal. 114, 121 [210 P. 820]; *Fischer* v. *Havelock* (1933), 134 Cal.App. 584, 588 [25 P.2d 864]; *Bohanon* v. *James McClatchy Pub. Co.* (1936), *supra,* 16 Cal.App.2d 188, 196 [60 P.2d 510]; *Phillips* v. *Larrabee* (1939), 32 Cal.App.2d 720, 725 [90 P.2d 820].) However, ''the right to exercise complete or authoritative control, rather than mere suggestion as to detail, must be shown.'' (*S. A. Gerrard Co.* v. *Industrial Acc. Com.* (1941), *supra,* 17 Cal.2d 411, 414 [110 P.2d 377]; *Moody* v. *Industrial Acc. Com.* (1928), 204 Cal. 668, 670-671 [269 P. 542, 60 A.L.R. 299]; *State Comp. Ins. F.* v. *Industrial Acc. Com.* (1941), 46 Cal. App.2d 526, 529 [116 P.2d 173].) ''One of the means of ascertaining whether or not this right to control exists is the determination of whether or not, if instructions were given, they would have to be obeyed.'' (*Press Pub. Co.* v. *Industrial Acc. Com., supra.*) The real test has been said to be

"whether the employee was subject to the employer's orders and control and was liable to be discharged for disobedience or misconduct; and the fact that a certain amount of freedom of action is inherent in the nature of the work does not change the character of the employment where the employer has general supervision and control over it." (*May* v. *Farrell* (1928), 94 Cal.App. 703, 710 [271 P. 789]; *Curcic* v. *Nelson Display Co.* (1937), *supra,* 19 Cal.App.2d 46, 50 [64 P.2d 1153]; see *Ryan* v. *Farrell* (1929), 208 Cal. 200, 203 [280 P. 945]; *Cameron* v. *Pillsbury* (1916), 173 Cal. 83, 85-86 [159 P. 149]; *George* v. *Chaplin* (1929), 99 Cal.App. 709, 712 [279 P. 485].) "Perhaps no single circumstance is more conclusive to show the relationship of an employee than the right of the employer to end the service whenever he sees fit to do so." (*Press Pub. Co.* v. *Industrial Acc. Com.* (1922), *supra,* 190 Cal. 114, 120 [210 P. 820]; *Chapman* v. *Edwards* (1933), 133 Cal.App. 72, 77 [24 P.2d 211]; see *Yucaipa Farmers etc. Assn.* v. *Industrial Acc. Com.* (1942), 55 Cal.App.2d 234, 237 [130 P.2d 146].) ■ The fact that the employee chooses his own time to go out and return and is not directed where to go or to whom to sell is not conclusive of the relationship and is not inconsistent with the relation of employer and employee, nor is the manner of payment a decisive test of the question. (*Easton* v. *Industrial Acc. Com.* (1917), 34 Cal. App. 321, 328 [167 P. 288]; *May* v. *Farrell, supra; Curcic* v. *Nelson Display Co., supra;* see *Cameron* v. *Pillsbury, supra; Phillips* v. *Larrabee* (1939), *supra,* 32 Cal.App.2d 720, 726 [90 P.2d 820].)

■ Where there is shown no express agreement as to the right of the claimed employer to control the mode and manner of doing the work, the existence or nonexistence of the right must be determined by reasonable inferences drawn from the circumstances shown, and is a question for the jury. (*Press Pub. Co.* v. *Industrial Acc. Com., supra; May* v. *Farrell, supra; George* v. *Chaplin, supra;* and see *Yucaipa Farmers etc. Assn.* v. *Industrial Acc. Com., supra.*) It is only where but one inference can reasonably be drawn from the evidence that the question of whether one is an employee or an independent contractor becomes one of law for the court. (*Chapman v. Edwards* (1933), *supra,* 133 Cal.App. 72, 79 [24 P.2d 211].)

■ Applying these tests to the evidence here, it is apparent that the question of the relationship which the company bore to Porter and Gray, as well as the relationship

between Porter and Gray, should have gone to the jury. The only specific acts which Porter testified he performed as dealer independently of suggestion or instruction from the company were the fixing of the price of the papers to the carrier boys and the division of his territory into such routes as he found "convenient"; as to all else in his relationship with the company he complied with its suggestions and instructions. If the company had seen fit to give specific instructions as to the price to be charged the carrier boys or as to fixing route divisions, it is reasonable to infer that the directions would have been obeyed implicitly. Counsel for the company state that the company did not require that Porter was to deliver his papers by automobile, by bicycle, on foot, by special messenger, or by any other specified means. However, as noted above, it is the right to control, rather than the exercise thereof, which is determinative. Aside from the right of immediate termination of Porter's agency reserved by the company under the written contract, the extensive supervision exercised by the company over Porter's activities as dealer, together with his designation as an employee under the 'group insurance plan and on the "Designation of Beneficiary" form, and his annual vacation "with pay," might well have served to convince the jury that the company's right of control over Porter as dealer was complete and that any instructions given to Porter would be obeyed. A finding to such effect would have ample support in the evidence.

In *Bohanon* v. *James McClatchy Pub. Co.* (1936), *supra,* 16 Cal.App.2d 188, 199 [60 P.2d 510], the broad statement is made that "It may now be regarded as settled in California that the control which has been adopted as the test by which the relationship between two persons is to be measured for the purpose of discovering whether such relationship is that of master and servant is complete or unqualified control," but the implications of such statement are qualified in the same paragraph by the much more limited declaration that "When one person is performing work in which another is beneficially interested, the latter is permitted to exercise a *certain measure of control for a definite and restricted purpose* without incurring the responsibilities or acquiring the immunities of a master, with respect to the person controlled." (Italics added.) In *Western Indemnity Co.* v. *Pillsbury,* (1916) 172 Cal. 807 [159 P. 721], cited as authority for the broad statement above quoted from the McClatchy Publishing Com-

102

pany case, the court says (at page 813): "It has been said that the true test of a contractor is that he renders service in the course of an independent occupation, following his employer's desires *in the results but not in the means used* ..., but in weighing the control exercised we must carefully distinguish between *authoritative* control and mere suggestion as to detail or the necessary co-operation where the work furnished is part of a larger undertaking." (Italics added.) In the case now before us the contract neither expresses nor implies any limitation upon the power of the publishing company to dictate the means used as well as the results to be obtained, and the conduct of the parties to the contract, in performing it, shows that the company exercised such control in many instances and that all its "suggestions" were accorded implicit obedience by Porter. That such "suggestions" carried the sanction of authority is manifest by the provision of the contract that the company could discharge the dealer; i.e., "may cancel this agreement at any time, if *in the opinion of the Company* the Dealer is ... *unsatisfactory in any manner* ... " (Italics added.) The contract sets no basis for the formation of the company's *opinion* as to what may be unsatisfactory and provides no standard by which the dealer may be judged. The right to discharge the dealer, therefore, rests not on the *quality* of his service but on the *opinion* of his employer. Even if we assume that the "opinion" could not be capriciously formed, it is apparent that if the dealer failed to carry out any "suggestion" made by the company, the latter could form an opinion that the dealer was unsatisfactory and thereupon discharge him. The very fact that the dealer had failed to "cooperate" in carrying out the "suggestion" would be evidence competent to negate any claim that the company's opinion was a mere caprice. Another fulcrum for imposing the leverage of the company's will upon the dealer exists in the contractual right of the company to fix and change both the wholesale price it charged the dealer and the retail price it required him to obtain from subscribers. Only within the ambit of practicality thus established by the company lay the "freedom" of the dealer to fix the price he charged his carriers. In the light of the foregoing discussion, it is difficult to conceive of a much more complete control of an employee doing work of a character inherently embodying some freedom of action than that which the company had the power to exercise over the dealer Porter. The case of *Batt* v. *San Diego Sun Pub. Co., Ltd.* (1937),

*supra,* 21 Cal.App.2d 429 [69 P.2d 216], relies upon the decision in the McClatchy case and adds nothing material to our consideration.

Counsel for the company have cited to us the case of *Rathbun* v. *Payne* (1937), 21 Cal.App.2d 49 [68 P.2d 291], as establishing that the inclusion of Porter as an "employee" on the blanket insurance policy does not fix his status as such. However, that case also states (at page 51) that "As in other cases, the relationship must be determined from the whole situation and not from isolated facts considered as constituting the whole"; it is this principle which controls here.

The case of *State Comp. Ins. Fund* v. *Industrial Acc. Com.* (1934), 2 Cal.2d 94 [39 P.2d 201], supports the conclusion that, in the transporting of the bundle of papers from Anaheim to Orange, Porter could not be said as a matter of law to have been an independent contractor. In that case a dealer, who was apparently conceded to be an independent contractor in his ordinary dealings with the newspaper publishing company from which he held an agency, was nevertheless held to be an employee of such company as to a weekly delivery for the company to another agent of an extra bundle of papers, for which the company paid the delivering agent $1.25 for each delivery. Therefore, even if the jury should have found that Porter was an independent contractor in his dealings with the company under the written contract, it could nevertheless have justifiably concluded that it was as an employee that he received the extra payment of $2.00 a week. Gray, in turn, with the knowledge of the company, was employed by Porter to make this delivery as well as to act as a general carrier.

If the jury should have determined that Porter was the employee of the company, then under the holdings of *Globe Indemnity Co.* v. *Industrial Acc. Com.* (1930), 208 Cal. 715 [284 P. 661], and *Call Pub. Co.* v. *Industrial Acc. Com.* (1928), 89 Cal.App. 194 [264 P. 300], the news carrier Gray was also the company's employee (see, also, *State Comp. Ins. Fund* v. *Industrial Acc. Com.* (1932), 216 Cal. 351, 355 [14 P.2d 306]).

The judgment in favor of the defendant Stockholders Publishing Company is reversed; the appeals of the other defendants are dismissed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., Carter, J., and Traynor, J., concurred.