[Civ. No. 6156. Third Appellate District.—January 24, 1940.]

JAMES C. CASSELMAN, Respondent, v. HARTFORD AC-CIDENT AND INDEMNITY COMPANY et al., Appellants.

Neumiller & Ditz, Jesse H. Steinhart and John J. Goldberg for Appellants.

Honey & Mayall for Respondent.

TUTTLE, J.—This is an appeal by the defendants from a judgment entered (on a jury's verdict), in the total amount of $13,680, in favor of plaintiff James C. Casselman, and against both defendants, J. A. Maguire and Hartford Accident and Indemnity Company, a corporation.

The action arose out of an automobile accident which occurred on the 29th day of January, 1937, in the county of San Joaquin, State of California, at the intersection of the Lincoln highway (U. S. Highway 50), and the so-called West Side highway, and Banta County road. The accident resulted in personal injuries and property damage to plaintiff, for which plaintiff was awarded the sum of $3,680. The accident also resulted in the death of the 17-year-old minor daughter of plaintiff, for which plaintiff was awarded the sum of $10,000.

The complaint of plaintiff was in two counts; in the first, plaintiff sought to recover damages for the death of his minor daughter, and in the second, plaintiff sought to recover for his own injuries and loss of personal property. In each cause of action plaintiff charged the defendants with negligence in the operation of the automobile which came into collision with the automobile being driven by plaintiff, and in which the minor daughter of plaintiff was riding. In the separate answers of the two defendants, all negligence on their part was denied and contributory negligence of the plaintiff was affirmatively pleaded.

The accident occurred at about 4 o'clock on the afternoon of January 29, 1937. U. S. highway 50, or the Lincoln highway runs generally in an easterly and westerly direction at the place where the accident occurred. The so-called West Side highway intersects with U. S. highway 50 and extends generally south therefrom. Extending to the north of U. S. highway 50, and intersecting the same at somewhat of an angle to the intersection of the West Side highway on the south side of U. S. highway 50, is a small county road, which extends northerly a distance of a quarter or half a mile to the small town of Banta.

At the time of the accident in question there was no stop sign on the north side of U. S. highway 50 controlling traffic traveling south from Banta along the small county road. A stop sign has been erected at this entrance to the through highway since this accident.

The plaintiff at the time in question was traveling from Banta south along the county road, and intended to cross over U. S. highway 50 and proceed southerly on the West Side highway to his home a short distance south of the through highway. Plaintiff had resided in the vicinity of this intersection of highways for a number of years and was thoroughly familiar with the same. A few moments before the accident, plaintiff drove from his home north along the West Side highway and brought his car to a stop before entering and crossing U. S. highway 50. He proceeded to Banta, where he picked up his daughter when she arrived by bus from school. His daughter seated herself in the right front seat alongside of her father, who then began the short trip home, proceeding, as above indicated, southerly from Banta along the small county road toward the intersection thereof with U. S. highway 50. The other facts are given in the following testimony of respondent:

Respondent Casselman testified that at the time of the accident, he was driving a 1932 Ford sedan, and was on his way home. He then gave the following testimony with reference to his actions immediately before and at the time of the accident:

"Q. Now as you came down the highway going in a general southerly direction and approaching this intersection did you see Mr. Maguire's car before you got to the intersection here? A. Yes, sir. Q. Now, about how far away were you from this intersection when you first noticed Mr. Maguire's car approaching? A. I was approximately a block and a half. Q. And what is your best information as to how far away he was from the intersection when you were about a block and a half away from the intersection? A. Approximately three blocks. Q. In other words, he was approximately twice as far away? A. Yes, sir. Q. Now, at that particular time, Mr. Casselman, when you were about a block and a half away, about how fast were you traveling as you were going along the highway? A. Approximately 25 miles an hour. Q. And did you form an estimate as to how fast he was approaching the intersection? A. About 40 or 45 miles an hour. Q. By the way, from the time you first saw him in the opposite direction that far away until this collision occurred were there any other cars in the vicinity of this intersection approaching on any of these roads? A. No, sir. Q. In other words, there were just the two of you

approaching that intersection at that time? A. Yes, sir, that is all. Q. At the time this collision occurred, Mr. Casselman, there was not any Stop Sign up there on the north side? A. Yes. Q. And you knew that at that time, did you not? A. I did. There never has been one there for a long time; never as I can remember. Q. And you were thoroughly familiar with this intersection prior to January 29, 1937? A. Yes, sir. Q. Did you continue to watch Mr. Maguire as he approached? A. Yes, sir; I was driving along but I noticed him coming. Q. What, if anything, did you do with reference to your speed as you entered the main highway here, did you increase or decrease your speed? A. I decreased it. Q. And just about how slow did you slow down your car, Mr. Casselman? A. I slowed down to approximately 20 to 15. Q. And then did you continue on and into the intersection after you slowed down? A. I seen at the right-of-way there, I looked up and seen the other car coming and then I proceeded on. Q. As far as you could tell, from the time you first saw Mr. Maguire's car until the time this collision occurred did his speed increase or decrease or did it maintain about the same rate? A. I figure it was about the same, 40 to 45. Q. Now, Mr. Casselman, *as you got to the intersection, which would be the north edge of the concrete highway here (indicating on Plaintiff's Exhibit X), about where was Mr. Maguire's car at that time, that is was he into the intersection or was he over to your right approaching the intersection? A. He was at least seventy-five feet toward Tracy. Q. Away from the intersection? A. Yes, sir.* Q. Now, just tell the jury in your own words, Mr. Casselman, what Mr. Maguire did, that is, how he began proceeding and how you got together? A. I proceeded out further to see if it was safe for a distance and I proceeded out further on but I did not see the danger until I got about here to the white line (indicating white line on plaintiff's Exhibit X) and I increased my speed and went over. Q. Did you at any time to your recollection swerve either to your right hand or to your left hand? A. I could not say; I may have swerved a little. Q. And you say you speeded up about the center of the intersection? A. Yes. Q. About what speed did you have your car at? About what speed did you have your car going up to the point of the collision? A. I think approximately 25. Q. And you were watching Mr. Maguire all the time up to where the

two of you hit? A. I was watching him. Q. Did he turn his car over one way or the other before the collision occurred? A. No; it was straight on until I was over to him and he swerved. Q. Which way did he swerve, to his right or left? A. To his right.''

Respondent further testified that he did not realize that there was any danger in his crossing the highway in front of defendant Maguire until he got about to the center of the highway on which Maguire was traveling. He stepped on the gas, thinking that defendant Maguire would go in back of him.

The physical facts of the accident show, without conflict, that the front end of Maguire's car was completely south of the Lincoln highway, and completely out of the intersection at the time of the accident, and that if he continued in a straight direction, or swerved slightly to his left, he could have easily passed to the rear of the plaintiff. The question is whether or not plaintiff's conduct, as described above, constitutes contributory negligence as a matter of law.

Taking up the appeal of defendant Maguire, it is contended that the evidence shows that respondent was guilty of contributory negligence as a matter of law.

■ ''Contributory negligence is a question of law only when the court is impelled to say that from the facts, reasonable men can draw but one inference, and that, an inference pointing unerringly to the negligence of the plaintiff contributing to his injury.'' (*Reaugh* v. *Cudahy Packing Co.*, 189 Cal. 335-343 [208 Pac. 125].)

''If but one conclusion can reasonably be reached from the evidence, it is a question of law for the court; but if one sensible and impartial man might decide that the plaintiff had exercised ordinary care, and another equally sensible and impartial man that he had not exercised such care, it must be left to the jury.'' (*Wahlgren* v. *Market St. Ry. Co.*, 132 Cal. 656-663 [62 Pac. 308, 64 Pac. 993].)

In the case of *Harper* v. *Knight*, 15 Cal. App. (2d) 655-657 [59 Pac. (2d) 1080], it is said:

''The circumstances under which a court can declare that certain acts constitute contributory negligence as a matter of law are rare. (*Enz* v. *Johns*, 112 Cal. App. 1 [296 Pac. 115].) The question is usually one of fact, and becomes one of law only when the evidence is of such a character that

it will support no other legitimate inference. (*Zibbell* v. *Southern Pacific Co.*, 160 Cal. 237 [116 Pac. 513].)"

That *portion* of the highway on which appellant Maguire was driving, and where the collision occurred, was not a "through highway", as there was no stop sign at the point where the road on which respondent was driving, entered it. As stated in section 82.5 of the California Vehicle Code:

"A 'through highway' is a highway or portion thereof at the entrance to which vehicular traffic from intersecting highways is required by law to stop before entering or crossing the same, and when stop signs are erected as provided in this code."

And as stated in section 550 (a) of the same code:

"The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection from a different highway."

The general rule governing the relative rights of drivers approaching an intersection is thus stated:

"Plaintiff, having entered the intersection first, had the right of way over the defendant's car. Even had the two machines approached the intersection at approximately the same time, the plaintiff's machine, as it was to the right of the defendant's, had the right of way over the latter. (Sec. 131, California Vehicle Act, Stats. 1929, pg. 541, sec. 55.) It was, therefore, the duty of the defendant to yield the right of way to the plaintiff. (*Crabbe* v. *Rhoades*, 101 Cal. App. 503 [282 Pac. 10] ; *Wynne* v. *Wright*, 105 Cal. App. 17, 21 [286 Pac. 1057] ; *Couchman* v. *Snelling*, 111 Cal. App. 192 [295 Pac. 845].) Furthermore, the plaintiff as a reasonably prudent person, had the right to assume that the defendant would obey the law and yield the right of way at the intersection." (*Leblanc* v. *Coverdale*, 213 Cal. 654 [3 Pac. (2d) 312].)

The record shows that respondent entered the intersection and had actually crossed the center of the main highway, when he was struck by the car of appellant Maguire. It was the duty of such appellant to "yield the right of way", under such circumstances. This he did not do, but continued to travel at an unabated speed of from forty to forty-five miles an hour. It is the contention of appellant Maguire that while respondent may have entered the intersection first, the following rule in *Pattisson* v. *Cavanagh*, 18 Cal. App.

(2d) 123, 127 [63 Pac. (2d) 868, 64 Pac. (2d) 945], is applicable to the facts of this case:

" . . . the law is also well settled that if it would appear to the mind of any reasonable person that the vehicle approaching the intersection on the arterial highway is near enough to constitute an immediate danger, *and under those conditions the driver of the other vehicle attempts to enter or cross the arterial, he is negligent in so doing even though he was the first to arrive at or enter the intersection.*"

We are then faced with the determination of whether or not respondent, as a reasonable man, thought that the car of Maguire was near enough to constitute an immediate danger. We are of the opinion that this question was a matter for the determination of the jury. We are not prepared to say, as a matter of law, that there was an immediate danger. The legal duty, upon the part of Maguire, to yield the right of way, was established. The burden of proving that he was absolved, by the conduct of respondent, from the consequences of his negligence resulting from this breach of duty, rested upon appellant. Whether or not he sustained that burden was properly within the province of the jury to determine, and we do not have the right or power to disturb the conclusion reached.

"Whether or not, therefore, plaintiff after observing the approach of defendant's car, its position, and the rate of speed it was traveling and keeping the same within his side vision, was justified in proceeding upon his rightful way across the intersection in advance of defendant, presents a question upon which reasonable minds might differ, and was therefore one for the jury to determine." (*Page* v. *Mazzei*, 213 Cal. 644 [3 Pac. (2d) 11].)

It is urged by appellant that, though no stop sign was erected at the intersection, the duty of stopping was imposed upon respondent as a matter of law, very much the same as the "stop, look and listen" rule is applied to one driving a vehicle across a railroad track. This is a novel contention, and apparently has some support from other jurisdictions. The rule has never been applied in California in respect to a highway intersection. The premise of the appellant is based upon the assumption that the highway on which Maguire was traveling, and on which the accident occurred, was a "through highway". As we have pointed out, this was not the fact. "Through highways" are not desig-

nated by law in this state as continuous in character. They are only such when running past an intersection at which stop signs have been erected. Where there is no sign, there is no such highway. In any event, it is the rule in California that one approaching an intersection of this character is governed by the provisions of the Vehicle Code, or, in the absence of any specific provision covering the situation, by the ordinary law of negligence. This case, as we have pointed out, is governed by a specific provision of such code. This appellant, in common with many users of the highway, seems to have the impression that every motorist who attempts to enter a main highway from a side road, does so at his peril. This misconception of the law is a prolific source of accidents. As we have shown, such motorist has very definite rights granted to him by the provisions of the Vehicle Code, and those users of the main highway who ignore such rights must be prepared to pay the penalty.

Finally, it is contended by this appellant that the verdict is excessive as a matter of law. The rule in this respect is thus stated:

"In every case of this character the soundness of the verdict must be determined by its own peculiar facts and circumstances. . . . Our power over excessive damages exists only when the facts are such that the excess appears as a matter of law, or is such as to suggest at first blush passion, prejudice, or corruption on the part of the jury. *Practically, the trial court must bear the whole responsibility in every case.*" (*Wiezorek* v. *Ferris,* 176 Cal. 353 [167 Pac. 234].)

In the case of *O'Meara* v. *Haiden,* 204 Cal. 354 [268 Pac. 334, 60 A. L. R. 1381], an award of $10,000 for the death of a seven-year-old boy was held not to have been excessive. Here, the minor was seventeen years of age. It is extremely difficult to measure in dollars and cents the pecuniary value of her services to her father, arising out of the loss of her society and comfort. Manifestly, such matters must be committed to the sound judgment and discretion of the jury. We find no evidence which would lead us to the conclusion that the award was based in any degree upon passion, prejudice or corruption; therefore, we cannot say, as a matter of law, that the verdict was excessive.

■ Taking up the appeal of Hartford Company, it contends that there is no evidence to support an implied finding of the jury to the effect that defendant Maguire was in its employ when the collision occurred, or that Maguire was the agent of Hartford Company. More specifically, it is contended that the evidence shows Maguire was an independent contractor. This, like other facts in the case, was a matter for the determination of the jury, and if there is any substantial evidence which shows, or from which it can be reasonably inferred that he was then employed by Hartford Company, and, acting within the scope of such employment, this contention cannot be upheld.

Defendant Maguire is and was during all the times mentioned, an attorney at law engaged in the general practice in San Francisco. It appears he had had considerable experience in investigating accidents for insurance companies, but in each case, except one, he had acted as an attorney also. This appellant, at the time of the accident, was engaged in the business of issuing policies of insurance against public liability arising out of the use of automobiles. The person in charge of its claim department is William H. Hitchings, who is an attorney at law. Some forty-eight persons handle the investigation of claims under his directions, and twenty-eight of them are lawyers. On January 28, 1938, the company received word of an accident involving a bus of the Greyhound Company, near the city of Stockton. It was the insurance carrier for the latter company. The regular lawyer for this appellant, who investigated claims arising in the Stockton territory, was not able to attend to the matter, so Hitchings called Maguire on the telephone and the following conversation took place, as related by the latter:

"Q. And on that day, Mr. Hitchings called you up on the telephone, is that not true? A. He did. Q. And about what time did he call you up, Mr. Maguire? A. About five minutes to twelve, noontime. Q. And he called you at your office? A. Yes. Q. And will you relate, as nearly as you can recollect, the conversation that he had with you at that time? A. He told me who he was and asked me if I had seen the Chronicle this morning about the bad accident in Tracy involving a Greyhound bus and two other cars. I said, 'No, I haven't read the Chronicle, but I heard about the accident over the radio at breakfast time', and he said,

'Well, that is the case, and I would like you to go down on that for us, can you go?' I said, 'Yes'. He said, 'Have you a car?' I said, 'Yes'. He said, 'Can you start at once?' I said, 'Yes'. And he said, 'Well, buy a Chronicle and get the details from that, and when you get to Stockton go to Gianelli's office and see Paul Riordan and he will give you the leads and contacts on those that you are to see there.' Q. Was that all the conversation that you can remember, Mr. Maguire? A. Well, that is all that occurs to me now. Q. Well, is it also true, in that conversation, Mr. Maguire, that Mr. Hitchings made it clear to you that you were to see Mr. Riordan and get your introduction to the assured? A. Well, I think he said something about that. I am not sure that he did or didn't, but he said, 'See Paul Riordan for your leads and contacts.' . . . Q. Now, Mr. Maguire, your sole purpose in leaving San Francisco on January 29th, and in coming up here to Stockton, was to investigate the accident for the Hartford, isn't that true? A. Yes. Q. You had no other business of any kind, did you? A. To investigate and report to them. Q. I mean you were out there just on their business at that time? A. That is the only piece of business I had.''

Hitchings' version of the above conversation is practically the same:

''Q. What did you tell Mr. Maguire over the telephone on this particular occasion? A. Our operator located Mr. Maguire and told him who I was. He identified himself, and I asked him if he had seen the Chronicle's story of the accident which had occurred near Tracy. My recollection is he said he had not seen it, but that morning over the radio prior to coming down town he had heard a news article, and he assumed it was the case I had in mind. He did know that an accident had happened there. Q. Go ahead and repeat the rest of the conversation—that is, what you said and what he said, Mr. Hitchings? A. What I said will have to be in substance, because I wouldn't attempt to use the exact words. Q. That is perfectly satisfactory. A. After saying he had heard that, I asked him if he could go to Stockton for us. He said he could. I asked him if he had an automobile. He said he did. I asked him if he could go now. He said he could. I said, 'All right, go ahead, and when you get to Stockton, you will call upon our agency there—the Gianelli

Agency, which represents our Company; there is a Mr. Riordan there'—I might have said 'Paul', but anyway I used the word 'Riordan'—you get in touch with him, and he will arrange for your leads and contacts'. He said he would go.''

The general rule is that, ''An independent contractor is one who in rendering services exercises an independent employment or occupation and represents his employer only as to the results of his work and not as to the means whereby it is to be done. Generally the circumstances which go to show one to be an independent contractor, while separately they may not be conclusive, are the independent nature of his business, the existence of a contract for the performance of a specified piece of work, the agreement to pay a fixed price for the work, the employment of assistants by the employee who are under his control, the furnishing by him of the necessary materials, and his right to control the work while it is in progress except as to results. All these matters are to be taken into consideration in determining whether or not a party is an independent contractor.'' (39 C. J., pp. 1315, 1316, sec. 1517.) In 2 California Jurisprudence Supplement, page 491, section 314, it is said: ''On the ground that the driver was his employee or using the vehicle in course of his business, a party defendant may be held liable for injury or damage which has resulted from the operation of a vehicle by another person.''

''Where it is sought to charge a defendant on the ground that the driver of the offending vehicle was his agent or employee, proof must be made, (1) that the driver was the employee of the defendant for some purpose, (2) that the driver's use of the vehicle was a contemplated incident of his employment, and (3) that the driver, at the time of the collision, was operating the vehicle in the transaction of the defendant's business. Similarly, a public officer is not liable for injury done by his deputy unless the latter was driving the offending vehicle in the line of his official duties and under color of office.'' (2 Cal. Jur. Supp., pp. 492, 493, sec. 315.)

''The question whether the driver of an automobile, whose negligence in driving is alleged to have caused an accident, was the servant, in so driving, of the owner or of the defendant sued on account of the accident, or was an indepen-

dent contractor, is usually, on the facts, a question for the jury. Whether or not the right of control or the want of it, determinative of the relationship, exists, is ordinarily a question of fact for the jury, and is usually arrived at by inference from the terms of the contract, the character of the employment, and all the relevant facts and circumstances. And the court is not justified in taking such question from the jury unless the evidence in regard to it is very clear and unequivocal." (10 Blashfield-Cyc of Auto. Law and Practice, sec. 6641, pp. 415, 416.)

We are of the opinion that there is sufficient evidence to support an implied finding to the effect that Maguire was an employee of this appellant. The former was instructed by the agent of this appellant to go to Stockton and make an. *investigation* of an accident which was covered by a policy of insurance issued by the Hartford Company. It is true that Maguire was a lawyer, but the jury could have reasonably inferred that upon this occasion the employment was merely in respect to the investigation of *facts* only, and that there was no contract of general employment as an attorney at law. Maguire was given instructions as to what he should do when he arrived in Stockton. The chief distinction between the status of an employee and an independent contractor lies in the matter of control over the acts of the party for whose conduct another is sought to be charged. If such power of control—such right to direct the manner in which the work is to be done—exists, then such party is an employee. In the case of *Press Pub. Co.* v. *Industrial Acc. Com.,* 190 Cal. 114, 121 [210 Pac. 820], it is said:

"As previously indicated, it is not the actual exercise of control, but the right of control—that is to say, the potential power of control—which is important in a determination of whether or not the status of an employee of independent contractor exists. (*Claremont Country Club* v. *Industrial Accident Commission,* 174 Cal. 395 [L. R. A. 1918F, 177, 163 Pac. 209].) One of the means of ascertaining whether or not this right to control exists is the determination of whether or not, if instructions were given, they would have to be obeyed."

The jury could readily have inferred that if directions were given to, and accepted by Maguire in respect to one matter, they could have been given in respect to another, and

that the *potential* power of control existed because it had been actually exercised. In addition to this factor indicating the presence of the power to control, another factor leading to the same conclusion is the existence of the right to discharge the employee and terminate the relationship. (*Smith* v. *Fall River Joint Union High School Dist.*, 118 Cal. App. 673 [5 Pac. (2d) 930].) The rule was applied in the latter case, although there was a written contract of employment. The manager of this appellant testified that he could have discharged Maguire if his work was unsatisfactory. Another such element of control is the fact that Maguire was taking the place of other regular employees of this appellant. As stated in *Press Pub. Co.* v. *Industrial Acc. Com., supra,* on page 120 of the opinion:

''In the absence of any express terms affirming or negating the power of control and direction, its existence must be determined from the reasonable inferences to be drawn from all of the circumstances surrounding and attending the making and execution of the contract considered in conjunction with the nature of the contract and the duties ordinarily to be performed thereunder. The circumstances attending the hiring of Benefiel warrant the inference that he was subject to the direction and control of the Press Publishing Company in the performance of his work. *The most significant fact in this regard and one which points towards the relation of employee rather than to the status of an independent contractor is the fact that Benefiel was hired on the same terms as the other carriers and the Press Publishing Company had the right to exercise the same direction and control over Benefiel as it did over the other carrier boys, concededly employees.*''

We do not deem it necessary to discuss in detail the numerous authorities relied upon by this appellant. As stated in the case of *Slater* v. *Friedman*, 62 Cal. App. 668, 670 [217 Pac. 795]:

''No subject in connection with the law applying to the operation of automobiles has given rise to more views than the question of the responsibility of an owner for the acts of his chauffeur and agents. The numerous cases upon the subject have been productive of much astute and interesting discussion in the courts, and eminent judges have differed widely in the application of the principles as applied to different cases. These cases are far from being in harmony on

the subject, and it is not an easy task to reconcile them." (Cal. Jur. Supp., vol. 2, p. 492.)

The judgment is affirmed.

Thompson, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 23, 1940, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 21, 1940.