**MacMILLAN v. MONTECITO COUNTRY CLUB, Inc.**

**Civ. No. 5177.**

District Court, S. D. California, C. D.

March 29, 1946.

Charles H. Carr, U. S. Atty., Ronald Walker and James C. R. McCall, Jr., Asst. U. S. Attys., all of Los Angeles, Cal., for petitioner.

Schauer, Ryon & McMahon, all of Santa Barbara, Cal., for respondent.

YANKWICH, District Judge.

The petition was filed on March 4, 1946, by Raymond Albert MacMillan, through the United States Attorney for the Southern District of California, under Section 8(e) of the Selective Training and Service Act of 1940, as amended, 50 U.S.C.A.Appendix § 308(e). It seeks the benefit of Section 308(b), 50 U.S.C.A.Appendix. Because, under Section 308(e), 50 U.S.C.A. Appendix, it is made the duty of the Court to grant a speedy hearing and to advance it on the calendar, I declined to hear the matter on an order to show cause, but, with the consent of the respondent, who filed an immediate answer, I agreed to hear it on the merits.

The petitioner served in the Armed Forces of the United States from January 11, 1944, to September 27, 1945, at which time he was honorably discharged. The respondent is a California corporation. It operates a golf and country club, and maintains a club and golf course in the City of Santa Barbara, County of Santa Barbara, California. For a period of two years, and up to February 1, 1944, following his induction, the petitioner was employed by the respondents as what is known in Country Club parlance as a "golf pro", —that is, a golf professional. After his separation from the service, he applied, orally, on October 20, 1945, for reinstatement to his former position. More formal application in writing was made on November 26, 1945.

The petitioner alleges, and it is not denied, that he is still qualified to perform the duties of his former position, and asserts that the circumstances of the respondent have not so changed as to make it impossible or unreasonable to restore him to his former position.

242

■ The controversy between the parties turns on the interpretation of the phrase "a position * * * in the employ of any employer." 50 U.S.C.A.Appendix § 308(b). As the object of the Selective Training & Service Act of 1940 was to insure that "the obligations and privileges of military training and service should be shared generally in accordance with a fair and just system", 50 U.S.C.A.Appendix § 301(b), we are bidden to interpret its terms liberally in order to effect its aim, which, in its reinstatement provision, is to restore the soldier to the position he left without any "greater setback in the private pursuit or career of the returning soldier than is unavoidable." Kay v. General Cable Corp., 3 Cir., 1944, 144 F.2d 653, 654.

■ To me, the phrase "position * * * in the employ of any employer" means more than the word "employee". I think it covers employee, but includes many more situations which could not be encompassed within the orthodox definition of the word "employee". As said by the Third Circuit in the case just cited: "The status which the Statute protects is 'a position * * * in the employ of' an employer—an expression evidently chosen with care. The word 'employee' was not used. While it may be assumed that the expression which was adopted is roughly synonymous with 'employee,' it unmistakably includes employees in superior positions and those whose services involve special skills, as well as ordinary laborers and mechanics. Of course, the words are not applicable to independent contractors, but, except for casual or temporary workers, who are expressly excluded, they cover almost every other kind of relationship in which one person renders regular and continuing service to another." Kay v. General Cable Corporation, supra, 144 F.2d at page 654.

These words, when used in this sense, have, generally, been interpreted to cover relationships which could not have been included had the word "employee" been used. Thus, in Morgenthau v. Barrett, 1939, 71 App.D.C. 148, 108 F.2d 481, it was held that a retired officer of the United States, although not actually performing any functions for the United States, is "in the employ of the United States", to such an extent as to prevent his acting as attorney before the Treasury Department under a statute barring such employment. 18 U.S.C.A. §§ 198, 203. Is the position from which the petitioner retired upon entering the service of the Armed Forces of the United States one covered by the statute or is he, as the respondent contends, an independent contractor or concessionaire?

The older cases and authorities sought to draw a rather rigid distinction between employees and independent contractors which later decisions have rejected.

■ The state of the law, at the present time, is such that we can safely say that the only fundamental difference between the two lies in control. An independent contractor is employed to perform certain specific work. He has absolute control over the manner of performing it, and is accountable to the other contracting party only for the result. However, a person occupying a position in the employ of another is one whose actions are under the control of an employer. See, Restatement of Agency, §§ 2, 220. Neither the manner of payment of wages nor the fact that a good deal of independence may be allowed in the employment is an absolute criterion in determining whether a person is or is not in the employ of another. And a person may be held to be in the employ of another, although, while performing certain services for the employer, he also performs services for himself, thus occupying a dual role. See, Restatement of Agency, § 236.

The following quotation from a leading California case (Ryan v. Farrell, 1929, 208 Cal. 200, 203, 204, 280 P. 945, 946), accords with the summary just given: "The fact that a certain amount of freedom of action is inherent in the nature of the work does not change the character of the employment where the employer has general supervision and control of it. * * * It is the established rule in this jurisdiction that where the servant is combining his own business with that of his master, or attending to both at substantially the same time, no nice inquiry will be made as to which business the servant was actually engaged in when a third person was injured; but the master will be held responsible, unless it clearly appears that the servant could not have been directly or indirectly serving his master."

It, in turn, accords with what is now the accepted law everywhere. 35 Am.Jur., Master and Servant, §§ 4 and 5; Standard Oil Co. v. Anderson, 1909, 212 U.S. 215, 220–222, 29 S.Ct. 252, 53 L.Ed. 480;

Western Express Co. v. Smeltzer, 6 Cir., 1937, 88 F.2d 94, 112 A.L.R. 74; Talbert v. Simms, 4 Cir., 1944, 143 F.2d 958; Cimorelli v. New York Central Railway Co., 6 Cir., 1945, 148 F.2d 575; May v. Farrell, 1928, 94 Cal.App. 703, 710–712, 271 P. 789 (a case which was specifically approved by the Supreme Court of California in Ryan v. Farrell, 208 Cal. 200, 280 P. 945, and which distinguished, and, in effect, overruled the earlier case of Barton v. Studebaker Corporation, 1920, 46 Cal.App. 707, 189 P. 1025, which is relied on by the respondent); Loper v. Morrison, 1944, 23 Cal.2d 600, 606, 145 P.2d 1; Burlingham v. Gray, 1943, 22 Cal.2d 87, 99, 100, 137 P.2d 9.

■ These cases stress not the actual exercise of control, but the right to exercise it, and the right to discharge, at any time, at will, as the decisive and infallible tests for distinguishing the status of employee from that of independent contractor. See also, S. A. Gerrard Co. v. Industrial Accident Commission, 1941, 17 Cal.2d 411, 413, 414, 110 P.2d 377; Jones v. Goodson, 10 Cir., 1941, 121 F.2d 176, 179, 180. And so this principle has been applied to denominate as an employer and employee relationship a variety of relationships which, under the old orthodox rules, could not be considered as such. Thus, a salesman selling automobiles on commission (Ryan v. Farrell, supra; May v. Farrell, supra); a lessee of land for growing of special crops (S. A. Gerrard Co. v. Industrial Accident Commission, supra); the head porter at a hotel (Pearson v. M. M. Potter Co., 1909, 10 Cal.App. 245, 101 P. 681); a golf caddy, who receives his payment from golfers (Claremont Country Club v. Industrial Accident Commission, 1917, 174 Cal. 395, 163 P. 209, L.R.A. 1918F, 177); newspaper carrier boys (Burlingham v. Gray, supra; California Employment Commission v. Los Angeles Down Town Shopping News Corporation, 1944, 24 Cal.2d 421, 150 P.2d 186); employees of a construction company hired by a railroad to unload and reload cars (Cimorelli v. New York Central Ry. Co., supra); owners of tractors employed to haul loaded trailers (Western Express Co. v. Smeltzer, supra); and taxicab operators (Jones v. Goodson, 10 Cir., 1941, 121 F.2d 176). And see, Casselman v. Hartford A. & I. Co., 1940, 36 Cal.App.2d 700, 712–714, 98 P.2d 539; Guarantee Insurance Co. v. Industrial Accident Commission, 1943, 22 Cal.2d 516, 139 P.2d 905.

The same liberal trend is found in the cases under the Fair Labor Standards Act. 29 U.S.C.A. § 201 et seq. See, Kirschbaum v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Walling v. Roland Electrical Co., 4 Cir., 1945, 146 F.2d 745. Thus, whether we deal with the responsibility of a person for the acts of those under his control, or with regulatory statutes, such as the Employer's Liability, 45 U.S.C.A. § 51 et seq., or Fair Labor Standards statutes, the Courts aim at broadening the base of responsibility or benefit in order to achieve desirable social results.

■ A war measure, aiming to retain for those who served in the Armed Forces of the country the advantages of previous employment, calls for this manner of approach. If the undisputed facts in this case be considered in this light, the conclusion is inescapable that the petitioner was not an independent contractor. The relationship here may be characterized in the words of the Tenth Circuit Court of Appeals in Jones v. Goodson, supra, 121 F.2d at page 180: "A reasonable measure of direction and control over method and means of performing the service is a constituent element of the relationship of master and servant as distinguished from that of master and independent contractor, still the direction and control need not relate to every detail."

There is disagreement as to some of the facts. But, in the main, the nature of the arrangement is undisputed. The petitioner was employed after a conference with the Board of Directors of the Club. He occupied rent free a small building on the premises, designated as the golf shop, in which he had a stock of merchandise, consisting of clubs, bags and other items used by golfers and in other sports. These were his own, which he purchased from his predecessor and resold for his own profit. He also owned equipment for cleaning and repairing golf clubs. The golf shop was also used for storage of golf clubs of members. The Club collected a monthly fee of one dollar for club care, which included storage and the cleaning of clubs left there,—work which often was not done by the petitioner, but by the caddies. This was paid over to him at the end of each month. He gave golf instruction to such

244

members of the Club or guests as desired it at a price of $4 per hour, fixed by the Club and paid to him. He was always available for appointments. He collected the green fees from such members as desired to pay cash or nonmembers, who were allowed to play on the golf course. He was charged with the collection of the "chits", or charge slips, for club care, green fees, or even golf lessons or equipment, which he sold, and which were charged to the members' accounts. When moneys due him for golf lessons or club care or equipment were charged to members' accounts, they were repaid to him upon surrender of the "chits". And, if, as happened only in rare instances, a member defaulted on the payment, he was held liable. There is some dispute about his authority over the caddy master. But it was admitted that his complaints were taken into consideration in discharging at least one caddy master. And, while persons desiring to become athletic members,—members with limited privileges at the Club for smaller fees,—had to be approved by the Board of Directors of the Club, the petitioner was allowed to take applications. He was in charge of all golf tournaments and their promotion. And we have the statement of one of his successors, whom officers of the Club consider an outstanding golf professional, that the conduct of such tournaments and other work performed by the golf pro makes him about the most outstanding person at a successful golf club. When he was absent from the Club, the caddy master, employed and paid by the Club, acted as his salesman without commission, and in making appointments for golf instruction for him. He also received lunches and other complimentary meals. Above all, his work had to be satisfactory to the members of the Club and, consequently, to the Board of Directors, who retained the right of discharging him at any time.

So, on undisputed facts, the two cardinal elements which make a relationship one of master and servant,—the right of control and the right to discharge at will,—are present here. And it is inconceivable that one holding such position could be called an independent contractor or—as respondent would have it,—a concessionaire, who was merely allowed to conduct a business of his own on the club's premises.

The rights and duties of the petitioner and the respondent are mutually beneficial and so interrelated that the only element absent which exists in the ordinary relationship of master and servant is the payment of compensation by the respondent. And as to that, the fees collected for club care and storage, which were turned over to him monthly, and which amounted to approximately $75.00, might even be considered compensation.

It follows that the petitioner was entitled to reinstatement.

There is no evidence in the record that the circumstances of the respondent have changed so as to make such reinstatement impossible or unreasonable, 50 U.S.C.A. Appendix §§ 308(b) 3(B).

■ The fact that another golf professional is now installed at the club cannot defeat the claim of the petitioner. It is presumed that, as to him, the Club has retained the right to terminate his employment. And if the Club, with the knowledge of the existence of this remedial statute, chose not to protect itself, it cannot be heard to complain. It is not necessary that the Club be in a position to force the present occupant of the golf shop to sell whatever goods he has on hand to the petitioner. It has been shown that the person who preceded the present occupant took away most of his equipment. And it is presumed that the petitioner will be required, upon restoration, to secure for himself such equipment and supplies as are called for in the performance of his duties.

■ The problem of compensating the petitioner for loss of benefits "suffered by reason of", 50 U.S.C.A.Appendix § 308(e), the refusal to reinstate is not easy. As the chief sources of income were lessons and sale of equipment, the profits realized during the two-year period when he was first employed are not conclusive. It is quite evident that the profits diminished either because of the falling off of lessons or of difficulty in securing items relating to the game of golf, to such an extent that in the fall of 1945, just before the petitioner sought reinstatement, the Club was compelled to pay for a period of two months, a salary of $150 to the golf professional to supplement the diminishing returns.

Benefits or profits are, at best, hard to estimate, except on the basis of average earnings over a period of years. We cannot do so here because there is no evidence as to what the earnings of the other professionals were after he left. In the ab-

sence of such a showing, about all the Court can do is to approximate a sum which, in justice and equity, would compensate for the loss of benefits. The petitioner has not shown why he did not seek other employment to diminish his loss when convinced that the respondent would not reinstate him, and, while waiting for restoration. So that, on the whole, to make an award on the basis of the profits he earned prior to his entry into the Armed Forces would be inequitable.

The law provides for compensation for "loss of wages or benefits suffered by reason" of the employer's refusal to reinstate a veteran.

The determination of the loss cannot be grounded upon the facts as they existed two years before. It must be made on the basis of the actual loss flowing from the refusal to reinstate. In the absence of the additional facts referred to, the Court feels that the sum of $150 a month is sufficient to compensate the petitioner for the loss suffered.

The petition for reinstatement is, therefore, granted, and the respondent is ordered forthwith to restore the petitioner to his former position as golf professional, and, until such restoration, to pay to the petitioner the sum of $150 per month from the 26th day of November, 1945.