[Civ. No. 14147.  First Dist., Div. Two.  Feb. 23, 1950.]

GLENNIE LEWIS, Respondent, v. CONSTITUTION LIFE COMPANY OF AMERICA et al., Appellants.

Parker, Stanbury & Reese and Raymond G. Stanbury for Appellants.

Marcel E. Cerf, Robinson & Leland and Emmet B. Hayes for Respondent.

GOODELL, J.—The plaintiff sued for $9,200 damages for personal injuries. A default was entered against defendant Frederick G. Law. The case went to trial against the other defendants, resulting in a verdict of $7,000. A new trial was denied and this appeal was taken from the judgment.

On a Sunday morning plaintiff's car was parked at the curb in front of his home on Carolina Street between 18th and 19th in San Francisco. Plaintiff was kneeling on the sidewalk reaching over the right front tire attempting to locate a minor mechanical defect when his car was struck by Law's car coming down the hill from 19th Street toward 18th with nobody at the wheel. The impact drove plaintiff's car onto him, pinning him under it and causing the injuries for which he sued.

Defendant Law was a representative of Mal K. Pillsbury Agency, the general agent in Northern California of Constitution Life Company (formerly called Postal Life). Law as such representative had solicited and obtained from a Mrs. Sylvester her application for insurance by the company and had received and turned in a premium payment of $30. She had failed to take the required medical examination and had finally written to the company her decision not to go forward with the policy.

The day before the accident the agency requested Law to call on Mrs. Sylvester to get back the receipt which he had given her for the $30, and to give her in return the company's check for the $30. He testified "I had special instructions to pick up that receipt before giving her the check." She lived on Carolina Street and he parked his car on that street at the curb near the corner of 19th. After completing the transaction he walked down the hill to call on another prospect and on returning found his car at the foot of the hill where it had run into a pole.

Pillsbury and the insurance company were joined as defendants on the theory that Law was their employee, acting within the scope of his employment at the time of the accident.

At the conclusion of the evidence appellants moved for a directed verdict on the ground, among others, "that it appears from the uncontradicted evidence that . . . Law occupied the status of an independent contractor," and the only question to be decided now is whether that motion should have been granted. If "the terms of the contract are precise and explicit and the evidence is reasonably susceptible of but a single inference, the question of whether one is a servant or an independent contractor becomes one of law for the court." (*Robinson* v. *George,* 16 Cal.2d 238, 242-3 [105 P.2d 914]; see, also, *Perguica* v. *Industrial Acc. Com.,* 29 Cal.2d 857, 859 [179 P.2d 812]; and *Montonya* v. *Bratlie,* 33 Cal.2d 120, 128-9 [199 P.2d 677].)

The plaintiff proved without dispute that Law's call upon Mrs. Sylvester was at the request of the agency, which made out a *prima facie* case "sufficient to support a finding of an employer-employee relationship" (*Robinson* v. *George, supra,* 16 Cal.2d 238, 244). In the case just cited it is said: "Of course, after plaintiff establishes a *prima facie* case, the burden shifts to the defendant corporation which then may prove, if it can, that defendant . . . was an independent contractor [citations]." See, also, *Isenberg* v. *California etc. Com.,* 30 Cal.2d 34, 38 [180 P.2d 11].

Appellants introduced a contract between the company and Law which they contend shows beyond dispute that Law was an independent contractor.

Section 1 thereof provides that "Nothing contained herein shall be construed to create the relationship of employer and employee between the First Party and the Agent. The Agent may exercise his own judgment as to the time and the manner

in which he may perform the services required to be performed by him under this Agreement, but the *First Party may*, from time to time, *prescribe rules and regulations respecting the conduct of the business covered hereby*, not interfering with such freedom of action of the Agent.'' Section 9 provides that ''*The Agent shall conform to the rules and regulations* of the First Party now or hereafter to become in force, *which rules and regulations shall constitute a part of this Agreement.* This provision shall not be construed to alter the relationship of the parties as provided in Section 1 hereof.'' (Emphasis added.)

Section 10 gives the company the right to cancel in case the agent breaches any ''material provision, condition or obligation of this contract. . . .'' This is the equivalent of saying that the agent can be *discharged* (see *Burlingham* v. *Gray*, 22 Cal.2d 87, 102 [137 P.2d 9], for a failure to obey the rules and regulations (a part of the contract).

Although the rules and regulations were part of the contract there was no proof of their contents. Had there been, the court or jury could have told whether they in fact interfered or not with the ''freedom of action of the Agent.'' If such rules and regulations existed (and the record is silent on the subject) their production would have removed all doubt as to the extent of control which they provided. Their absence was not accounted for. It was not incumbent on plaintiff to prove them since his prima facie case of an employer-employee relation had been made out.

█ With respect to the contract, the jury was correctly instructed that ''The principal can not avoid liability to others for injuries caused them as a result of the agent's negligence . . . merely by entering into an agreement with the agent that the relationship of principal and agent shall not exist between them.''

█ While the record is unsatisfactory and inconclusive respecting rules and regulations, it is by no means lacking in affirmative evidence, introduced as part of plaintiff's case, that instructions in the form of a sales manual and letters had been issued to the solicitors.

Law testified: ''Q. Did you have any general set of instructions or anything of that kind from the Constitution Life Company . . . then known as the Postal Union Life Insurance Company? A. Well, we had a sales manual and we received letters now and then as to changes to be made in applications for the insurance. Q. That manual is issued by

whom? A. At that time it was issued by the Postal Union Life Insurance Company. Q. And turned over to you by Mr. Pillsbury? A. Yes.''

In their closing brief under the heading ''The sales manual'' appellants touch this subject very lightly and somewhat evasively by saying: ''It is obvious that the furnishing of order and application forms, and of a price list, does not transform an independent solicitor into an employee.'' Law was not asked anything about *forms or price lists*; he was asked whether they had ''any general set of instructions or anything of that kind'' and gave the responsive answer that he had received *a sales manual and letters*. Appellants, however, with every opportunity to do so, did not prove the contents of the manual. It is well within the possibilities that it contained the rules and regulations, as it certainly was an appropriate place for them. Law's testimony that they had a manual certainly invited proof of whatever *instructions* it contained, and the absence of such proof left the case wide open for the conclusion that the manual (with or without the rules and regulations) instead of showing the ''freedom of action'' so conspicuously avowed by the contract, showed the very opposite. The burden, it must be remembered, had shifted to the defense to show that no right of control over means or methods had been reserved, and the manual was the company's handbook of instructions to its agents and within its power to produce. ''When the evidence tends to prove a material fact which imposes a liability on a party, and he has it in his power to produce evidence which, from its very nature, must overthrow the case made against him if it is not founded on fact, and he refuses to produce such evidence, a presumption arises that the evidence, if produced, would operate to his prejudice, and support the case of his adversary.'' (10 Cal. Jur. 779.) *Breland* v. *Traylor Eng. & Mfg. Co.*, 52 Cal.App. 2d 415, 425-6 [126 P.2d 455], discusses this question comprehensively and to the point.

Appellants argue that an independent contractor is entitled to some control over the party working for him. Nobody will question this, but such an argument—with nothing specific about it—loses most, if not all, of its force in the light of the failure, just discussed, to let the court and jury know anything about the instructions to the solicitors.

This brings us to the inquiry into control at the time in question. The ''doctrine of *respondeat superior* applies only where the relation of master and servant is shown to

exist between the wrong doer and the person sought to be charged with the result of the wrong, at the time and in respect to the very transaction out of which the injury arises." (*Luckie* v. *Diamond Coal Co.*, 41 Cal.App. 468, 483 [183 P. 178].) All the cases hold that the *right of control* is the principal test in cases such as this. Actual control, however, is evidence of right of control (*Casselman* v. *Hartford etc. Co.*, 36 Cal.App.2d 700, 712, 713 [98 P.2d 539]). There is clear and uncontradicted testimony that Law had precise instructions from the agency when he was sent upon his mission.

When Law was requested to call on Mrs. Sylvester the agency left him no "freedom of action" in his dealings with her. It left him no discretion as to the method of exchanging the receipt for the $30 check. The order in which this exchange was to be effected and the precise manner of doing it was laid out to him by the agency. Law testified "I had special instructions to pick up that receipt before giving her the check." True he admitted on cross-examination that he would always do that, but the fact remains that he had "special instructions" from the agency to do it that way.

In addition to the force of this as an independent piece of evidence of unquestioned control on the occasion involved herein the jury could readily have drawn from it the inference that if the agency so acted at that time it so acted at other times "and that the *potential* power of control existed because it had been actually exercised" (*Casselman* v. *Hartford etc. Co., supra,* pp. 712-13). The case at bar is particularly susceptible to this and other inferences because of appellants' failure to lay before the jury the rules and regulations or the manual and letters which might have shown that Law indeed had "freedom of action."

As indicated earlier, ". . . the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689]). That being so, there is no necessity to discuss the several factors, shown by the contract and the other evidence, on which appellants rely to show an independent contractor relationship. It may be conceded that such other factors are present in this case and that a judgment the other way might well have. been affirmed. (See

*Lee* v. *Nanny,* 38 Cal.App.2d 90, 94, 95 [100 P.2d 832] ). However we are satisfied that under the rules we have cited the case was properly given to the jury and it was its function—under instructions which are not attacked—to draw its own inferences.

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.